Chief Judge Fuld.
We recently decided, in Rankin v. Shanker (23 1ST Y 2d 111), that public employees and labor organizations representing them were not entitled to a trial by jury in a criminal contempt proceeding for the violation of sec *179 tion 210 (subd. 1) of the Taylor Law.[1] In so holding, we concluded that a legislative classification ‘ ‘ which differentiates between strikes by public employees and employees in private industry ” is reasonable and does not offend against the constitutional guarantee of equal protection of the laws (23 N Y 2d, at p. 118). The case now before us calls upon the court to determine, primarily, whether the Taylor Law’s mandate that public employees shall not strike and that labor organizations representing them shall not cause or encourage a strike violates due process requirements of the State or Federal Constitution.
At about seven o’clock in the morning of February 2, 1968, virtually all of the sanitation men in the City of New York — employees of the Department of Sanitation — failed, without excuse, to report for work.[2] Later in the day, at a demonstration *180 in front of City Hall, members of the Uniformed Sanitationmen’s Association (referred to herein as the “ Union ”) were addressed by their president, the defendant De Lury, in these words:
“ Your sentiments before was go-go-go. I’d accept a motion for go-go-go (cheers). All in favor signify by saying yes (cheers). All opposed (boos). I didn’t come here to bargain, I took a firm position with the City, I gave the members a final offer of this union. Now I want to show discipline, here this morning — or this afternoon — I don’t want to show where there is confusion in the members-—You got a job at the locations to see that this is effective 100% (cheers).”
A nine-day strike, ending on the night of February 10, resulted. During that period, few, if any, of the sanitation men reported for work, in consequence of which garbage and refuse accumulated on the city streets at the rate of 10,000 tons a day. This constituted a serious health and fire threat; indeed, the Commissioner of Health characterized the “ garbage situation ” as “ a serious one to the health of the city ” and the Fire Commissioner declared that the Fire Department “ experienced a marked increase in the number of outside rubbish fires ”.[3]
On February 2, the very day the work stoppage began, the City instituted the present action to enjoin the defendants from ‘' striking ’ ’ and moved for a preliminary injunction. A temporary restraining order was granted which enjoined the carrying on of the strike and required the leaders of the Union to instruct the members to return to work. Three days later, on February 5, the court at Special Term granted a preliminary injunction which again contained a directive to De Lury that he shall “ forthwith instruct all members [of the Union] not to engage or participate in any strike, concerted stoppage of work or concerted slowdown against the plaintiff.” Although, because of the health and fire hazards involved, immediate compliance with the orders-was vital, the members of the Union, as previously noted, remained away from their jobs until February 10.
*181 An application, brought on by order to show cause, to punish the Union and De Lury for criminal contempt for willfully disobeying the restraining order, came on for hearing before the court; the testimony adduced concerning the strike and its effects, as well as the conduct of Be Lury, was substantially as outlined above. When the City, through its Corporation Counsel, stated that it was prepared to call witnesses to establish that the sanitation men "had [not] received instructions from Mr. Be Lury to report back to work ", defense counsel conceded that, if witnesses were called to the stand - as the Corporation Oonnsel proposed-" they would testify that they did not receive any instructions from Mr. Be Lury to go back, because Mr. Be Lury did not send them out, and Mr. Be Lury did nothing to bring them back. These are the facts which are known to everybody."[4]
At the conclusion of the hearings, the court, dismissing charges which had also been asserted against other officers, found De Lury and the Union guilty of criminal contempt for willfully disobeying its lawful mandate. It sentenced De Lury to 15 days in jail and fined him $250 and it fined the Union $80,000; in addition, the. court ordered that the Union’s right to dues check-off be forfeited for a period of 18 months.[5] The Appellate Division affirmed Special Term’s orders and granted the defendants leave to appeal to our court on a certified question.
We consider, first, the defendants’ contention that the Taylor Law is unconstitutional on the ground that, in prohibiting strikes by public employees, it deprives them of due process of law. Manifestly, neither the Fourteenth Amendment to the Federal Constitution nor the Bill of Rights of the State Constitution (art. I) grants to any individual an absolute right to strike. On the contrary, that right is subject to the qualification that, if a strike is for an illegal objective, it is enjoinable at the instance of an aggrieved party. To cull from the opinion of the Supreme Court in Auto Workers v. Wisconsin Bd. (336 U. S. 245, 259-260), “ ' the exercise of the unquestioned right to [strike] ’ * * * did not operate to legalize the sit-down strike, which
*182 state law made illegal and state authorities punished. [Case cited.] Nor, for example, did it make legal a strike that ran afoul of federal law [case cited]; nor one in violation of a contract made pursuant thereto [case cited]; nor one creating a national emergency [case cited].”
Although acknowledging that the right to strike is not absolute, the defendants would have us read the opinion in the Auto Workers case to mean that a prohibition against strikes will be upheld only where workers strike in violation of a no-strike clause or where there is a secondary boycott, violence or a trespass such as a sitdown. There is no basis for so narrowly viewing that decision. The Supreme Court did not limit the doctrine there applied to instances of illegal strikes mentioned by it. Bather, it laid down a general rule, applicable in all cases involving illegal strikes, namely, that the State, in governing its internal affairs, had the power to prohibit any strike if the prohibition was reasonably calculated to achieve a valid State policy in an area which was open to State regulation. (Cf. Teamsters Union v. Vogt, Inc., 354 U. S. 284, 294-295.)
Our query must, therefore, be whether the condemnation of strikes by public employees, as provided in the Taylor Law, does effectuate a valid policy of our State.
For many years, strikes against the Government have been outlawed by special legislation and by common law. Today, no less than 20 States have statutes condemning strikes by some or all of its public employees and at least seven States have achieved the same result by the application of common-law principles. (See Bubin, A Summary of State Collective Bargaining Law in Public Employment, published by Cornell University in 1968.) In addition, a Federal statute specifically provides that strikes by Federal employees are illegal (U. S. Code, tit. 5, § 7311). Substantial reasons are at hand for this almost universal condemnation of strikes by public employees. As Professor George W. Taylor, an outstanding authority in the field of labor relations and one of the architects of the Taylor Law, put it (Public Employment: Strikes or. Procedures?, 20 Industrial and Labor Belations Bev. 617, 619),
“ One of the vital interests of the public which should be conserved in the government-employee relationship is the ability of representative government to perform the *183 functions of levying taxes and, through the budgeting of governmental resources, of establishing priorities among the government services desired by the body politic.”
Quite obviously, the ability of the Legislature to establish priorities among government services would be destroyed if public employees could, with impunity, engage in strikes which deprive the public of essential services. The striking employees, by paralyzing a city through the exercise of naked power, could obtain gains wholly disproportionate to the services rendered by them and at the expense of the public and other public employees. The consequence would be the destruction of democratic legislative processes because budgeting and the establishment of priorities would no longer result from the free choice of the electorate’s representatives but from the coercive effect of paralyzing strikes of public employees. (See Final Report [March 31, 1966] of the Governor’s Commission on Public Employment Relations [hereafter referred to as the Taylor Report], pp. 15-16).
It was undoubtedly because of such considerations that Governor Thomas E. Dewey, in his Memorandum approving the Condon-Wadlin Act (L. 1947, ch. 391) — the predecessor of the Taylor Law—declared (N. T. Legis. Ann., 1947, pp. 36-37):
‘[1] The duty of public employees is to the whole of society. A strike of firemen could overnight permit the destruction of a whole city. A strike of police could endanger the safety of millions of people and all their possessions. A strike of sanitation workers could almost overnight produce an epidemic threatening the lives of other millions of people ”.
And President Franklin D. Roosevelt expressed himself in similar fashion in 1937, some 10 years earlier (Public Papers and Addresses for Tear 1937 [1941] Letter of Aug. 16, 1937, p. 325):
“ Upon employees in the Federal service rests the obligation to serve the whole people, whose interests and welfare require orderliness and continuity in the conduct of Government activities. This obligation is para *184 mount. Since their own services have to do with the functioning of the Government, a strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable.”
The courts which have dealt with the constitutional question under discussion have concluded that no provision of either the Federal or State Constitution prevents the State from outlawing strikes by public employees. Thus, our court (Matter of Di Maggio v. Brown, 19 N Y 2d 283; Pruzan v. Board of Educ., 9 N Y 2d 911, affg. 12 A D 2d 923, affg. 25 Misc 2d 945; see, also, City of New York v. Social Serv. Employees Union, 48 Misc 2d 820), as well as the courts of sister States (see, e.g., Norwalk Teachers’ Assn. v. Board of Educ., 138 Conn. 269; Detroit v. Division 26 of Amalgamated Assn., 332 Mich. 237, app. dsmd. 344 U. S. 805; Cleveland v. Division 268 of Amalgamated Assn., 41 Ohio Op. 236), have expressly rejected constitutional objections to legislation prohibiting and punishing strikes, by public employees. Indeed, in upholding the constitutionality of the Condon-Wadlin Act in the Di Maggio case (19 N Y 2d 283, supra), Judge Bubke, writing for a unanimous court, had this to say about that statute (pp. 287-288):
“ Petitioners claim that Condon-Wadlin is unconstitutional on its face because it constitutes a bill of attainder, imposes excessive fines and inflicts cruel and unusual punishment. None of these allegations is sustainable. In Pruzan v. Board of Educ. (9 N Y 2d 911 [1961]) the constitutionality of Condon-Wadlin was at least impliedly asserted. Moreover, it cannot reasonably be said that the law constitutes a bill of attainder, ‘ a legislative act which inflicts punishment without a judicial trial.’ (Cummings v. Missouri, 4 Wall. [71 U. S.] 277, 323 [1866].) There is no constitutional provision which vests one with the right to governmental employment, or which bars the imposition of reasonable and necessary limitations and conditions on *185 such employment. Consequently, a statute which incorporates such limitations on governmental employment cannot be construed as a bill of attainder. There is numerous authority to the effect that it is against public policy for public employees to strike, and many courts have held that such a strike is unlawful, illegal and may be restrained and enjoined.” (Emphasis supplied.)
In the case before us, the Legislature, after declaring (Civil Service Law, § 200) that “it is the public policy of the state * * * to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government ”, recited that such policy is best effectuated by “ continuing the prohibition against strikes by public employees and providing remedies for violations of such prohibition.” Furthermore, the Taylor Report, which preceded the enactment of the Taylor Law, found, after an exhaustive study of the matter, that the right of public employees to strike ‘ ‘ is not compatible with the orderly functioning of our democratic form of representative government ” (p. 19).
In view of the strong policy considerations which led to the enactment of the Taylor Law, it is our conclusion that the statutory prohibition against strikes by public employees is reasonably designed to effectuate a valid State policy in an area where it has authority to act and that the provisions of subdivision 1 of section 210 do not offend any due process rights of the defendants.
In view of our recent decision in the Shanker case (23 N Y 2d 111, supra), no extended discussion is required in addressing ourselves to the defendants’ point that the prohibition against strikes by public employees (or their representative organizations) violates the equal protection clause of either the United States or the New York State Constitution. (See, for a recent discussion of the problem of equal protection of laws, Locomotive firemen v. Chicago, R. I. & P. R. Co., 393 U. S. 129; [37 New York Cent. B. B. Co. v. Lefkowitz, 23 N Y 2d 1.) As we had occasion to observe in Shanker (23 N Y 2d, at p. 116),
*186 “ Ever since the enactment of the Norris-LaGnardia Act and our State’s Little Norris-LaGnardia Act, the view has been uniformly and consistently held that a legitimate distinction between public and private employment is constitutionally permissible. This has been recognized * * * with regard not only to the prohibition against strikes but also to the issue, now confronting us, affecting jury trials.”
There are a number of factual differences between employment in the public and private sectors which furnish reasonable justification for disparate treatment vis-á-vis the right to strike. Thus, for instance, the necessity for preventing goods or services being priced out of the market may have a deterrent effect upon collective bargaining negotiations in the private sector, whereas, in the public sector, the market place has no such restraining effect upon the .negotiations and the sole constraint in terms of the negotiations is to be found in the budget allocation made by responsible legislators. Again, the orderly functioning of our democratic form of representative government and the preservation of the right of our representatives to make budgetary allocations—free from the compulsions of crippling strikes — require the regulation of strikes by public employees whereas there is no similar countervailing reason for a prohibition of strikes in the private sector. (See Taylor Report, pp. 15-16.) Nor does the fact that many employees in private industry also perform vital services render the distinction unreasonable. As to this, it is sufficient to note that, although the Legislature is not barred from enacting laws regulating the relationship between the State or its subdivisions and public employees, it cannot regulate labor relations in the private sector with respect to most industries (e.g., privately owned railroads, airlines, etc.) where a strike could paralyze a city without, as we observed in the jRankin case, running into conflict with Federal legislation, such as the National Labor Relations Act and the Railway Labor Act, and thereby violating “ the exclusive primary jurisdiction of Federal administrative agencies vested with the authority to deal with such matters ” (23 N Y 2d, at p. 118, n. 3).
In view of the basic differences between public and private employment, it may not be said that a classification which pro *187 hibits strikes by public employees while failing to legislate against strikes by employees in the private sector is unreasonable, especially when it is considered that strikes by public employees, unlike private employees, have always been subject to injunctions by the courts. Consequently, we conclude here, just as we did in'[1] jRankin (p. 119) that, “as of the present [time], legislative differentiation between public and private employees, insofar as restrictions on their right to strike and to jury trials are concerned, is reasonable.”
The defendants’ argument — that they are entitled to a trial by jury despite their failure to request one —may be disposed of summarily. In our decision in Rankin v. Shanker (23 N Y 2d 119, supra), as the lines already quoted from the opinion in that case establish, we expressly held that a jury trial in a criminal contempt proceeding such as this (under Judiciary Law, § 753-a and Labor Law, § 808) is not available to public employees, or to officers of labor organizations representing them, charged with violation of the Taylor Law (Civil Service Law, § 200 et seq.). This, of course, applies equally to the present defendants. .
Nor is there any substance to the further contention that the city failed to prove there is evidence that De Lury disobeyed any mandate of the court. The strike was open and notorious. Its devastating impact on the City of New York and its inhabitants, including the danger of fire and the hazard to health, was known to the defendant, as it was to all New Yorkers. The court’s order that the strike be terminated and that De Lury, as president of the Union, instruct his men ‘ ‘ not to engage or participate in ” the strike was clear beyond cavil. The defendant not only failed to obey that injunction but, going to the other extreme, actually urged the men to make the strike “ effective 100% ”. What the proof convincingly demonstrated, the concession of the defendant’s counsel rendered indisputable. We cannot accept the highly technical or hair-splitting arguments urged upon us in an attempt to evade compliance with the court’s lawful mandates. Indeed, when confronted with a somewhat similar situation in United States v. Mine Workers (330 U. S. 258, 307, concurring opn.) — a case in which an adjudication of criminal contempt was based on disobedience of an order enjoin *188 ing a strike — Mr. Justice Frankfurter, after observing that we are “ ' a, government of laws and not of men ’ ” (p. 307), went on to say in language most appropriate here (p. 312):
“ In our country law is not a body of technicalities in the keeping of specialists or in the service of any special interest. There can be no free society without law administered through an independent judiciary. If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny. Legal process is an essential part of the democratic process. For legal process is subject to democratic control by defined, orderly ways which themselves are part of law. In a democracy, power implies responsibility. The greater the power that defies law the less tolerant can this Court be of defiance. As the Nation’s ultimate judicial tribunal, this Court, beyond any other organ of society, is the trustee of law and charged with the duty of securing obedience to it.”
We have considered each of the other arguments advanced by the defendants and find them so tenuous as to require no comment.
In conclusion, then — subdivision 1 of section 210 of the Civil Service Law, designed to prevent the paralysis of Government, offends against no constitutional guarantee or requirement. Self-interest of individual or organization may not be permitted to endanger the safety, health or public welfare of the State or any of its subdivisions. There was here indisputable proof not only of deliberate disobedience of the explicit provisions of the Taylor Law but willful defiance of the court’s lawful mandates as well. Such defiance, the more egregious when committed by employees in the public sector, is not to be tolerated.
The order appealed from should be affirmed, with costs, and the question certified answered in the affirmative.
Opinion by Chief Judge Fuud. All concur, Judges Burke, Bergan and Keating on constraint of this court’s decision in Rankin v. Shanker (23 N Y 2d 111) insofar as the right to a jury trial is concerned.
Order affirmed, etc.

. The Taylor Law was enacted in 1967 (L. 1967, ch. 392; Civil Service Law, art. 14, §§ 200-212) to supersede the Condon-Wadlin Act (L. 1947, ch. 391, adding Civil Service Law, former § 22-a, renum. by L. 1958, ch. 790, as Civil Service Law, former § 108). Like its predecessor, the Taylor Law prohibits strikes by public employees (§ 210, subd. 1) but, unlike Condon-Wadlin, it does not mandate termination of employment for its violation. The Taylor Law grants to all public employees (which, broadly speaking, includes all employees in the service of the State or any subdivision thereof) rights which in the main they did not formerly possess, namely, the right to be represented by employee organizations of their own choosing and the right to negotiate collectively with public employers and, in addition, the right to require public employers to negotiate and to enter into collective agreements with them. It sets up a Public Employment Relations Board — known as PERB — to “resolve * * * disputes concerning the representation status of employee organizations” and to assist in the “ voluntary resolution ” of disputes between public employers and employee organizations. It also authorizes, under the so-called “ home rule ” section (Civil Service Law, § 212), the adoption by local governments of “provisions and procedures” which are “substantially equivalent” to those of the Taylor Law. The New York City equivalent of such law is Local Law No. 53 of 1967 but the parties did not utilize the machinery therein provided for resolving disputes between the city and municipal employee organizations. All public employees, whether or not covered by the “home rule” section (§ 212), are subject to the statutory mandate of section 210 (subd. 1) of the Civil Service Law prohibiting them from striking.

. The City and the Uniformed Sanitationmen’s Association had labored long in an attempt to arrive at a new collective agreement to replace one which expired on June 30, 1967. Bargaining between the parties, which commenced in December of 1966, had dragged along for the entire year of 1967 and through January, 1968. On January 31, 1968, a mutually agreed upon mediation panel formulated a settlement agreement which, though accepted by the City, was rejected by the Union stewards.

. On the sixth day of the strike, a volunteer group of some 500 men collected hospital refuse, the accumulation of which created an especially dangerous threat of disease.

. The City was ready to call 10 witnesses, having planned to issue 100 subpoenas addressed to that number of employees.

. The fines imposed, as well as the period for which .the Union’s dues check-off rights were forfeited, were the maximum authorized by the applicable statute (Judiciary Law, § 751, subds. 1, 2, par. [a]).