In a proceeding pursuant to section 751 of the Judiciary Law to punish the defendants for criminal contempt, in which defendants cross-moved to dismiss the proceeding on several stated grounds, the appeal, as limited by appellants’ brief, is from so much of a judgment of the Supreme Court, Suffolk County, dated October 22, 1975, as, after a hearing, (1) adjudged appellants to be in contempt of a *856 temporary restraining order of the same court, dated September 2, 1975, (2) fined the appellant association the sum of $65,000 and the individual appellants the sum of $250 each, (3) ordered the incarceration of the individual appellants for stated periods and (4) failed to grant the cross motion in its entirety. Judgment modified, on the law, by deleting so much thereof as found the appellant association guilty of Specification A5. As so modified, judgment affirmed insofar as appealed from, with costs to petitioner. The findings of fact are affirmed. Appellants’ time to pay the fines is extended until 10 days after service upon them of a copy of the order to be made hereon with notice of entry thereof. In the event that the association does not pay its fine within the time prescribed herein, then the dues check-off provision of the judgment appealed from shall become operative. The terms of imprisonment of the individual appellants shall begin 10 days after service upon the Sheriff of Suffolk County of a copy of the order to be made hereon with notice of entry thereof. There is no language in the temporary restraining order which prohibits the appellants from picketing the homes of the petitioner board’s members. We have carefully considered all other issues raised by appellants and find them to be without merit. Cohalan, Acting P. J., Hargett and Hawkins, JJ., concur; Shapiro, J., concurs insofar as the majority is (1) deleting Specification A5 and (2) upholding (a) the finding that appellants were guilty of contempt and (b) the punishment imposed upon the appellant association, but otherwise dissents and votes to further modify the judgment insofar as it is appealed from by deleting those portions thereof which imposed punishment upon the individual appellants, with the following memorandum, in which Damiani, J., concurs. Appellants appeal, as limited by their brief, from the portions of a judgment of the Supreme Court, Suffolk County, dated October 22, 1975, and made pursuant to an order to show cause dated September 12, 1975, which (1) adjudged each of them guilty of criminal contempt of court for violating the terms of a temporary restraining order contained in an order to show cause dated September 2, 1975, (2) imposed punishments on them therefor and (3) denied their cross motion to dismiss the order to show cause, except that it did dismiss (a) the proceeding as against Richard P. Lee and Judith Hubner and (b) so much of Specification A3 as charged the appellant Half Hollow Hills Teachers Association with following employees of the petitioner home from work. The Special Term found (1) that, with the foregoing exception, the association had willfully disobeyed the provisions of the temporary restraining order, as charged in Specifications A1 through A6 of the September 12 order to show cause, and was, therefore, guilty of criminal contempt and (2) that the individual appellants (Carol Roseman, Colin Parker, Frank Cantoni, William Walters, Frank Seibert, John Kennedy and Carol Goldfarb) had willfully disobeyed the provisions and requirements of the temporary restraining order, as charged in all specifications of the order to show cause, except for Specification B2E, and were, therefore, guilty of criminal contempt. The judgment appealed from imposed a fine of $65,000 upon the association payable to the Treasurer of the County of Suffolk, ordered that appellants Roseman, Parker, Cantoni and Walters be imprisoned for 20 days, ordered that appellants Kennedy, Seibert and Goldfarb be imprisoned for 10 days and fined each of the said individuals $250, payable to the county treasurer. I dissent from so much of this court’s decision as upholds the punishments imposed upon the individual appellants. Unfortunately, to make the reasons for my position clear, a rather lengthy review of the record becomes necessary.
*857 THE ISSUES
The appellants attack the validity of the temporary restraining order as being too vague to give them notice of the conduct in which they could not engage. They also attack the constitutionality of the Taylor Law on the grounds that (1) the different treatment accorded police and firemen under section 209 of the Civil Service Law (L 1974, ch 725, §§ 1-3) denies teachers equal protection of the laws and (2) teacher strikes are not an interference with an essential government service and there is, therefore, no police power justification for denying teachers, as contrasted with policemen, firemen and sanitationmen, the right to bargain collectively and to strike. Appellants attack the validity of the September 12, 1975 order to show cause on the grounds that it was so vague as to fail to give the required notice, that there was no proof by affidavit of the specifications charged and that it charged appellants with conduct not proscribed by the September 2 order. Appellants also claim error by Special Term in (1) admitting into evidence testimony of their conduct prior to the issuance of the September 2 temporary restraining order and after September 12, the date on which it was replaced by Mr. Justice Aspland’s injunctive order, (2) taking judicial notice of an oral direction by Mr. Justice Aspland to appellants on September 8 and of its own oral direction on September 18 that the teachers return to work, (3) considering, in determining the sanctions to be imposed, testimony which had been offered in support of specifications which it had dismissed and (4) holding that the specifications it sustained had been proved beyond a reasonable doubt. The appellants also attack the penalties imposed as being excessive. Finally, they contend that the judgment appealed from is defective because it does not comply with the requirement of section 752 of the Judiciary Law, that the "mandate of commitment” set forth the particular circumstances of their offenses. While most of the foregoing contentions lack merit, I would sustain the appellants’ contentions that Special Term improperly took judicial notice of Mr. Justice Aspland’s oral order of September 8 and that it improperly relied on evidence supporting specifications of criminal contempt which it had dismissed, and considered such in determining the sanctions which it imposed.
NEGOTIATIONS PRIOR TO THE STRIKE
An examination of the activities of petitioner and appellants is relevant to some of the issues raised on this appeal. Those activities are described in an affidavit of the appellant Roseman, sworn to September 25, 1975 and submitted in support of the appellants’ cross motion to dismiss the September 12 order to show cause, and in the testimony of witnesses for both sides received at the hearings on the order to show cause to punish appellants for contempt, signed by Mr. Justice McCarthy on September 12, 1975. The parties appeared for a hearing under the show cause order on September 18, 1975. On that date, Mr. Justice Scileppi orally admonished the individual appellants to return to work the following day, Friday, September 19, 1975, and he then adjourned the matter for the taking of testimony, which he heard on September 29 and 30, 1975. A member of the board of education testified that negotiations between the board and the appellant teachers association on a new contract for the upcoming school year started some time back in January or February, 1975. The board offered an increase of only 1.5% without giving an annual increment, even though a 3.13% annual increment had been customary up to that point without regard to further increases negotiated by collective bargaining. The board insisted on this minimal and unmoving offer even though its budget, as approved by the *858 voters of the Half Hollow Hills School District, included funds for a 7% increase for the salaries of teachers in the district. It was not until the evening of September 1, 1975, the day before the teachers were to report for work for the new school year to prepare for the opening of the term on September 3, that the board of education raised its offer to 6.13% consisting of the normal annual increment, plus 3% in additional new money. According to the affidavit of appellant Roseman, president of the teachers association, the negotiator for the board of education, during the period from February to September 1, 1975, while persisting until the latter date in offering only a 1.5% increase, with loss of the increment increases, advised the union’s negotiating team to tell the teachers that "the gravy train is over” and that "they are lucky to have jobs.” After only four negotiating meetings from February to April, the board’s negotiator indicated that the parties were at an impasse and he declared an impasse under the Taylor Law on April 25, at the start of the scheduled fifth negotiating session. The Public Employment Relations Board (PERB) thereupon appointed a fact finder who met with the parties on June 24, July 2 and July 30 in an effort to mediate the contract disagreement. On August 18 both sides submitted their evidence in support of the contract proposals to the PERB fact finder. On August 26 the fact finder issued a report recommending a one-year contract with a salary increase of 8%, noting that this increase, while substantially in excess of the board’s offer, would keep teachers’ salaries in the district below the combined average teachers’ salaries for the neighboring Huntington and Babylon school districts, and "less than the full allowance for rises in the cost of living plus catch-up.” The PERB fact finder’s report states that "while some of this differential is closed by the higher increment (roll-up) in the HHH School District, the salary gap in terms of effective wages with these neighboring districts is pronounced nonetheless.” The fact finder’s report also states: "On the other hand, the Board is persuasive that salary increases beyond the IV2 offered requires tax increases. The * * * Teacher Association points out that such increased tax rates would still be low relative to other comparable and neighboring School Districts. Moreover, this relatively good tax position for the School District would persist even if teachers were provided the IIV2 increase needed to catch up with combined teacher salary averages in the districts of Hunting-, ton and Babylon or the close to 20% increase needed to recover the erosion in teacher real wages due to cost of living rises.” The report noted that "fiscal objectives however desirable in and of themselves need, nonetheless, be balanced by considerations of equity. Teacher salary increases generally are averaging about 8% without increment (roll-up). In any case, it is my considered judgment that this figure represents a fair and equitable salary increase and that the tax impact, burdensome as it is, is not out of proportion relative to that borne by the citizenry of school districts generally and, in particular, in comparable nearby communities.” In'the face of this recommendation, the board of education persisted in its offer of 1.5% without any increment until September 1, 1975, when it finally offered 3%, in addition to the regular increments, a sum still less than the amount it had included for teacher salary increases in the budget for the school year. According to the Roseman affidavit, the board not only began to advertise for substitute teachers to serve during a strike, who were to be paid $50 per day, as compared with the $30 per day ordinarily paid to substitutes, but it also had applicants for substitute positions fill out applications at a table set up in the hallway leading to the room in which the fact-finding and negotiating processes were being carried on. The affidavit states that, during *859 the same period, the board continually warned the teachers’ negotiating representatives that the Taylor Law would be fully and forcefully implemented. Finally, the affidavit states that the board’s offer on September 1, of 3% plus restoration of increments, "was accompanied by elimination of other benefits and safeguards in the prior contract of a higher value.” None of the foregoing allegations in the Roseman affidavit was in any way mentioned or contradicted by the board in its papers or by its witnesses. After the board’s negotiator finally made the higher offer of September 1, 1975, the association called a membership meeting on September 2, at 8:00 a.m., at which the appellant Roseman reported on the status of negotiations for a contract. Thereafter a motion was made and seconded from the floor that the teachers should strike if the association could not conclude a contract by September 3, the day the schools were to open for the term. That motion was carried by a standing vote of some 80% or 85% of the membership. The members also voted to go to school on September 2 and to perform their duties as teachers on that day in the hope that a contract would be concluded by September 3.
THE TEMPORARY RESTRAINING ORDER
On September 2, 1975 the individual appellants and other officers of the appellant teachers association, and the association itself, were served with an order to show cause why a preliminary injunction should not be made enjoining and restraining them from engaging in seven different forms of conduct consisting, in essence, of engaging in a strike against the board of education. It also directed the appellants "to forthwith instruct all members of the half hollow hills teachers association not to engage or participate in any strike”. The order was signed by Mr. Justice John G. McCarthy. On Tuesday evening, September 2, the teachers association’s negotiating committee met with the school board’s negotiators. Negotiations were broken off late that night.
THE ONSET OF THE STRIKE AND ITS CONCLUSION
Thereafter the association’s executive board advised the membership by phone not to go to work on September 3. There were picket lines in front of the petitioner’s schools on the morning of September 3 and, thereafter, on all school days through September 18. In the hearings before Special Term on September 29 and 30, testimony was adduced that the seven individual appellants participated in the picketing and remained out on strike until a contract was agreed upon on the weekend of September 20 and 21.
THE ORDER TO SHOW CAUSE OF MR. JUSTICE ASPLAND AND THE PROCEEDINGS BEFORE HIM
On September 4, 1975 Mr. Justice Aspland signed an order to show cause in which the appellants (1) sought an order vacating the temporary restraining order ab initio and (2) opposed the petitioner’s motion for a preliminary injunction. On the basis of that September 4 order, the return date of the temporary restraining order of September 2 was put over to September 8. On that date, Mr. Justice Aspland heard oral argument from both sides and set September 10 as the date for an evidentiary hearing. At the conclusion of the September 10 hearing, however, he said to counsel for the appellants: "Very well, counsel. I think that the court should point this out: That in substance, the court is directing you, if you will, to instruct all members of the Teachers Association to—that’s the Half Hollow Hills Teachers’ Association, not to engage or participate in any strike or any stoppage of work or any slow down, and directly or indirectly in any way contributing to a so- *860 called 'strike’. This, in substance, is what the court has told you before and is telling you now, and is there anything further we can do than that? We wish to make our position clear * * * and I see no reason why counsel, as officers of the court, wouldn’t do the same thing to their clients.” Counsel for the petitioner then raised the question of notice to particular officers of the association, saying: "I think the court must understand my concern as far as that counsel has indicated to the court that they followed the admonition of the court, and all I said to the court, and I respectfully request again, instead of * * * having conveyed this admonition to their clients as such, now we’ve got it up to a point of officers. You know, was it to the Secretary? Was it to the President?” The court responded: "Well, counsel, I would leave this entirely to the discretion of counsel, should they see fit to reply. I think you may recall, counsel, in our last discussion about this matter, it was alluded to that you would indicate to your clients that a temporary restraining order, no matter what you call it, is in the nature of a preliminary injunction.” To which the then counsel for the appellants, Mr. Congress replied: "Right, has the exact same penalties and affect [sic] as a preliminary injunction.” "the court: Now, are you in a position to indicate to the court to whom you did communicate that to, and I’m asking you only if you see fit to tell the court. I’m not ordering that. mr. congress: Well, with all due deference, your Honor, I do not wish at this time to set forth a log of who I spoke to and when, the court: But you did convey it to your clients? mr. congress: Yes, your Honor. I followed to the fullest your Honor’s request and did convey it.” It would appear from the foregoing that Mr. Justice Aspland had, on September 8, requested counsel' for the appellants to inform his clients that they were barred from striking and from in any way contributing to a strike and that the temporary restraining order was in the nature of a preliminary injunction. On Thursday September 11, Mr. Justice Aspland handed down a memorandum decision granting the petitioner a preliminary injunction and denying appellants’ application to dismiss. He held that the petitioner’s allegations were sufficient to state a cause of action, that appellants’ .assertion that the petitioner was not bargaining in good faith was unsupported and that, contrary to appellants’ contention, adequate jurisdictional facts had been alleged. On Friday September 12, Mr. Justice Aspland signed an order containing a preliminary injunction which was thereafter filed in the county clerk’s office and was served upon appellants’ counsel.
THE ORDER TO SHOW CAUSE TO PUNISH FOR CONTEMPT
On September 12, Mr. Justice McCarthy signed the "Order to Show Cause to Punish for Criminal Contempt” which is the basis for the instant proceeding. Copies of that order were served on the appellants Roseman, Parker, Cantoni, Seibert, Walters, Goldfarb and Kennedy, as individuals, and as officers of the Half Hollow Hills Teachers Association. On Thursday, September 18, the date the contempt order was returnable, Mr. Justice Scileppi adjourned the hearing, though he orally admonished the appellants to direct the members of the association to return to work the next morning, September 19. On that occasion, unlike those of September 8 and 10, the record demonstrates that each of the seven individual appellants was present in court and acknowledged receiving Mr. Justice Scileppi’s direction. The sole testimony as to whether the association’s attorneys had conveyed Mr. Justice Aspland’s admonition to the individual appellants (other than the statements made by Mr. Congress at the hearing on September 10, in which he acknowledged that he had indicated to his "clients” that a *861 "temporary restraining order * * * is in the nature of a preliminary injunction”, without specifying to which of them he had so indicated), is that of the one member of the association’s executive board, Richard Lee, who testified as a petitioner’s witness. He testified, under a grant of immunity, that the attorneys told him and three members of the association, none of them members of either the executive board or of the negotiating committee, in "Judge Aspland’s Court” on September 8, 1975, of "the admonition”, but he failed to detail the contents of that admonition, stating only that he believed "they told me that at that time to curtail some of our activities on the picket line.” The witness also testified: "No, I know that they [the teachers] didn’t go back to school on the 9th, but I don’t recall that being part of the Judge’s admonition that we go back to school. It wasn’t on the 9th.” Despite the inconclusive nature of the testimony discussed above, especially as to whether the seven individual appellants received notice of Mr. Justice Aspland’s command that they and the association’s members return to work, the Special Term, on the issue of sanctions, took judicial notice of Mr. Justice Aspland’s oral command to the appellants on September 8, to return to work. After Mr. Justice Scileppi’s order to the appellants at the hearing on September 18, 1975, the individual appellants, the members of the executive board, the two members of the negotiating team who were not members of the board, and their counsel met for a period lasting until 4:00 a.m., on September 19. At that meeting they decided not to ask the association’s members to return to work on Friday, September 19, but, instead, to ask them not to picket. On September 19, 1975 the strike was settled; an agreement was signed by the petitioner and the association on Sunday, September 21. On Monday, September 22, practically all of the regular teachers were back in school. There is nothing in the record which shows the terms of the agreement between the parties.
THE PROVISIONS OF THE TEMPORARY RESTRAINING ORDER
The temporary restraining order granted by Mr. Justice McCarthy on September 2 contained language enjoining and restraining the appellants, pending the hearing and determination of the petitioner’s motion for a preliminary injunction, from: "A. Engaging in, causing, instigating, encouraging, or condoning, threatening, or rendering support or assistance of any nature to any strike, concerted stoppage of work or slowdown in the performance of any duties of employment with the plaintiff [petitioner]; B. Interfering in any manner, directly or indirectly with Plaintiff, its officers, representatives, agents or employees, or preventing them or any of them from engaging in the performance of any duties in behalf of Plaintiff or in any manner interfering with or affecting the orderly continuance of the functions of the Plaintiff, its officers, representatives, agents or employees; C. Committing, attempting or directing the taking of any action which is likely to cause any employees of the Plaintiff to decline or discontinue work for said Plaintiff; D. Committing, attempting or directing the taking of any action to induce, persuade, intimidate any person, association, firm or corporation or their employees to initiate or continue any agreement to fail or refuse to make deliveries to or for Plaintiff or to fail or refuse to perform services for Plaintiff or interfere in any manner with the operations or functions of the half hollow hills central school district, Towns of Huntington and Babylon, State of New York; E. Interfering in any manner, directly or indirectly, with students attending school at the Plaintiff’s facilities, premises or buildings, or preventing said students, their parents and/or legal guardians, or any of them, from entering, remaining upon, or *862 leaving any of the aforesaid school premises, facilities and/or buildings, and from doing anything to interfere with or prevent, directly or indirectly, the orderly instruction of said students, or any of them, by Plaintiff, its officers, agents, members and representatives, servants, or employees; F. For any of the purposes or with any of the effects set forth in sub-paragraphs A, B, C, D or E above: Picketing, patrolling, congregating, walking back and forth upon any school district premises, or in front of or in the vicinity of school district buildings, or offices or any other premises operated and administered by Plaintiff or at any point in proximity thereto or calling meetings or causing crowds to collect in front of said premises or causing or permitting any officers, agents, members, representatives, servants or employees of the half hollow hills teachers association, or any other person to do, perform or engage in or participate in any or all such acts. G. Agreeing, conspiring or combining to perform any of the foregoing or any other acts tending to injure, damage or destroy or interfere in any manner with the operation or functions of half hollow hills central school district, Towns of Huntington and Babylon, Suffolk County, State of New York, or doing any act in furtherance of any such agreement, conspiracy or combination”.
THE PROVISIONS OF THE SEPTEMBER 12 ORDER TO PUNISH FOR CONTEMPT
Mr. Justice McCarthy’s order to show cause to punish appellants for criminal contempt dated September 12, consisted of (1) six specifications, A1-A6, setting forth how the appellant Half Hollow Hills Teachers Association had willfully disobeyed the temporary restraining order of September 2, as continued by the order of September 8, and (2) nine specifications, B1 and B2A-B2H, setting forth how the nine named individuals had willfully disobeyed the same order. Specification Al, which is based upon paragraph A of the September 2 order to show cause, charged that the association, on September 3 to 5 and 8 to 12, engaged in a strike against the Half Hollow Hills School District. That is not in dispute. Specifications A2 and A3, which are based upon paragraphs B and C of the September 2 order to show cause, charged that the association, on the same days, interfered with the orderly continuance of the functions of the petitioner by blocking various premises of the petitioner and took action to close petitioner’s premises, harassing petitioner’s employees who were entering and leaving petitioner’s premises and following certain employees home. Specification A4 is based upon paragraph D of the September 2 order, and charged that the association, on the same days, picketed in front of petitioner’s premises in an attempt to induce petitioner’s nonstriking employees to cease working for the petitioner. Specification A5 sought to extend the provisions of paragraph B of the September 2 order to bar picketing in front of the homes of members of the petitioner’s board, and charged that, at various times on the same and other days, the association picketed in front of the homes of members of the board. Specification A6 charged that, on September 12, the association willfully disobeyed the September 2 order by blocking the access road to petitioner’s transportation center by parking and abandoning cars on the access road, thereby preventing petitioner from using its school buses to pick up children. Specification B1 charged the nine named individuals with willful disobedience of the September 2 order by engaging in a strike against the petitioner on the same eight days. Specification B2A charged the individuals with engaging in, causing and supporting a strike in willful disobedience of the September 2 order; Specification B2B made a similar charge of willful disobedience, based upon violation of paragraph F of the *863 September 2 order by their interference with students attending school at petitioner’s facilities, by preventing them and their parents from entering and leaving those facilities and by frustrating the orderly instruction of those students by petitioner and its employees. Specification B2G is a catchall based upon paragraph G of the September 2 order. It charged the individuals with conspiring to perform the acts charged in the prior specifications and with other acts tending to damage and interfere with the operation of the Half Hollow Hills Central School District. Specification B2H was based upon a recitation in the September 2 order which sought a direction that the appellants "forthwith instruct all members of the half hollow hills teachers association not to engage or participate in any strike, concerted stoppage of work, concerted resignation, or concerted slowdown against the Plaintiff”. But the ordering paragraph of the September 2 order declared only that the appellants "are hereby enjoined and restrained from committing or engaging in any of said acts set forth in Items A through G above.” Hence the direction sought in the above-mentioned recitation, which was not included in items A through G, is not a part of the ordering paragraph of the September 2 order.
THE HEARINGS OF SEPTEMBER 29 AND 30, 1975
Part of the testimony given at the hearings before Mr. Justice Scileppi, dealing with negotiations between the board and the association during February to September, prior to the strike, has been discussed above. The balance of the testimony requires some further comment. The first witness was Theodore Pickus, Personnel Administrator of the Half. Hollow Hills Central School District. He testified to a fact which the appellants offered to concede, that the teacher attendance records he was charged with keeping showed that, on September 3-5, 8-12 and 16-19, some 785 to 790 teachers of the total of 806 were absent, including all seven of the individual appellants. He also testified to having observed teachers picketing at several of the district schools between September 3 and September 18. The witness stated he was present at a negotiating meeting between the association and the board of education on the night of September 11. He testified that at that meeting, in response either to an appeal by the board’s president for the teachers to return to work, or to a question by the superintendent as to how to get the teachers back in school, the appellants Roseman, Cantoni, Parker and Goldfarb said that the teachers would not return, that Roseman said she had taken them out proudly and they would not return without a contract and that Cantoni had made allusions to the difficulties in negotiations. The witness also testified that he had received no instructions from September 19 to 21 from his superiors concerning notification to the substitutes who had worked on Friday the 19th, as to whether they were to report to school on the 22nd in the event of a strike settlement and that quite a few of the substitutes came to school to work on Monday, the 22nd, even though practically all the regular teachers were back in school on that day. Petitioner’s second witness was Coleman Lyons, superintendent of schools of the district. He testified that on the morning of September 3, he passed various schools in the district and saw groups of teachers picketing at the schools. He visited practically every school in the district and continued to do so for the entire length of the strike, and saw teachers picketing the schools, except for the days he was in court, the 10th and 18th of September. He saw the appellant Cantoni picketing at one school on September 4 and the appellant Walters picketing at another school on the same day. He saw no pickets, however, on September 19. He testified that, on two occa *864 sions at one elementary school, he had observed that pickets were "screaming and shouting, name calling” and that scab stickers were being affixed to [substitutes] automobiles” as they were attempting to get through picket lines. He also testified that on September 10 he met with the appellant Roseman at the motel used for negotiation meetings and she told him that he should' do everything he possibly could to help end the strike or that all hell would break loose. Finally, he testified that, on the morning of September 12, the striking teachers delayed the school district’s school bus transportation operations for from half an hour to two hours by parking cars in the roadway used by the buses to leave the transportation center. He was unable, however, to identify the owners of the 50 or so parked cars he saw or to identify by name any of the teachers he had seen there. A member of the board, Monty Brandman, testified that he saw teachers picketing at the entrances to several schools on September 3 and 4 and that, on the 4th, he heard pickets hissing at children boarding the school buses in the afternoon. He also heard pickets call the substitute teachers "scabs” and "S. O. B.s” when they left the school. On other days of the strike he visited some district schools and saw teachers picketing. On the evening of September 15, Yom Kippur, a group of teachers picketed his home and one voice, the source of which he could not identify, yelled at his younger son: "Just wait until you get back to school; boy, are you going to get it.” The witness was also present at a school when a working substitute teacher had a picketing teacher arrested for scratching her car with a sharp instrument. The witness walked with the substitute to the police officer on the premises and stayed with them while the substitute made her complaint. Upon the testimony of two photographers who had taken pictures of the picket lines for the petitioner, the board offered still photographs and films in evidence; the individual appellants Roseman, Parker, Walters and Kennedy were identified in those pictures as members of picket lines. The next witness for petitioner was Michael Mania, the chief fiscal officer of the school district. He testified that the association’s annual income from checkoff of its dues of its 782 members was $118,082. Much of the testimony of Richard Lee, a member of the appellant association who was not served with the September 12 order to show cause signed by Mr. Justice McCarthy and against whom the case was therefore dismissed, and who testified under a grant of immunity, has been largely summarized above. He testified also that, at none of the several membership meetings of the association which he attended during the strike period, was any direction given to the teachers to return to work by any members of the executive board and that the only times the executive board told the members not to picket were on September 19 and on September 5, when picketing was stopped at one school building which was under construction in order to facilitate continuation of construction. The total suspension of picketing on September 19 was in response to the September 18 oral direction by Mr. Justice Scileppi to the striking teachers to return to work immediately. The witness also stated that the reason no direction to return to work was issued to the striking members was that the association’s officers could not enforce such a recommendation. The next witness was Donald Bond, president of the petitioner board of education. He testified to a meeting between some of the individual appellants and the board of education on September 11, 1975 at which he had appealed to the appellants to bring the teachers back and to continue negotiations. In response, the appellant Roseman said that she had led them out proudly and could not ask them to come back. He also testified that on September 7 he had met with Mrs. Roseman alone and had twice asked her *865 to return and negotiate and that she had said that there was no contract, that she would not ask them to come back and that they would not come back. She also told the witness that she had the solid backing of her people. At the September 11 meeting both Cantoni and Goldfarb said that they could not ask the teachers to come back. The witness also testified to having seen teachers picketing during the strike at various schools and, on one occasion, at the home of a board member, and to having had a "scab” sticker affixed to his car fender by a picket when he visited a school. On cross-examination he testified that in February, 1975 the board’s opening offer was an increase of 1.5% and termination of the regular annual increments, and that the board did not better that offer until September 1, when it made what he described as its "final offer” of 3% plus restoration of the annual increments, which he valued at 3.13%. He also testified that, at a public board of education meeting on September 22, he had announced that the board "anticipated revenues of $1.2 million” from Taylor Law penalties. He stated that when the school budget was submitted to the voters it contained 7% for increases in teachers’ salaries but that such amount was never offered to the teachers. He also testified that, at the time the budget was being prepared, he heard a member of the board suggest that no money be put in the budget for the teachers and that in the discussion at the time it was said that if that were done, it would probably lead to a strike. Superintendent Lyons was then recalled. He testified about the adverse affect of the strike on the school system’s educational program, stating that the delay in starting the kindergarten and special education programs for handicapped children and the athletic programs had harmed all three programs. He also acknowledged that the board had rejected an offer by the teachers association to make up the days lost because of the strike. The appellants then made the superintendent their witness and, through his testimony, established that despite the inclusion of a no reprisal clause in the agreement settling the strike, his subordinates had, on September 23, instituted a policy of refusing to hire substitutes who had refused to accept such work during the period of the strike. The appellants’ next witness was Mrs. Gladys Siegel, whose son and daughter-in-law were employed by the school district as teachers. They had both been on strike from September 3 to 19. She testified that she was a taxpayer and resident of the school district and had known the witness Ryder, a board member, for many years and that she had called him on September 23 to complain about the additional expense of $20,000 to $30,000 which the board of education had incurred by allowing the substitutes to report for work on September 22. In the course of his response, Ryder told her that "the school Board had saved a million, five hundred thousand dollars” as against $300,000 in strike expenses. He also told her that the board had acted deliberately. Mr. Ryder, called by the petitioner in rebuttal, stated that when he spoke to Mrs. Siegel he told her about the termination of the strike and stressed the point that "our tax rate would not increase because of the entire confrontation”. He also said that he told her, in response to her complaint about the board’s failure to notify the substitutes not to come in on September 22, that such failure had involved an extra cost of $20,000 and, when she became angry, he told her that the over-all strike cost to the board was $300,000, and that "the ñnes alone may represent over a million dollars in compensation to the school district which will offset the $300,000 and the negligible amount of $20,000 which we discussed momentarily” (emphasis supplied). The hearings were thereafter concluded.
*866 THE JUDGMENT UNDER APPEAL
On October 22, 1975 the Special Term granted the judgment appealed from, which consists of 12 decretal paragraphs. The first granted the portion of the cross motion which sought to dismiss the order to show cause as against Richard P. Lee and Judith Hubner, based upon the lack of personal service of the order to show cause upon them. The second granted the portion of the cross motion which sought to dismiss Specification A3 of the order insofar as it charged the association with following employees of the petitioner home from work. The third denied the cross motion in all other respects. The fourth declared that the association had done all the other acts set forth in the Specifications (A1 through A6) of the order to show cause, and was therefore guilty of criminal contempt of court in having willfully disobeyed the provisions of the temporary restraining order of September 2, 1975. The fifth declared that Carol Roseman, Colin Parker, Frank Cantoni, William Walters, Frank Seibert, John Kennedy and Carol Goldfarb had done all the acts charged against them in the September 12 order to show cause, except for the acts charged in Specification B2E and were therefore guilty of criminal contempt of court in having willfully disobeyed the provisions of the September 2 temporary restraining order. The sixth imposed a fine of $65,000 against the association. The seventh authorized the chief fiscal officer of the petitioner, if the fine were not paid to the Treasurer of the County of Suffolk within the time limit established therefor in the preceding decretal paragraph, to accumulate the "check-off dues” currently deducted on behalf of the association until the sum of $65,000 had been reached, which sum would then be paid to the county treasurer. The eighth imposed jail terms of 20 days each upon appellants Roseman, Parker, Cantoni and Walters. The ninth imposed jail terms of 10 days each upon appellants Kennedy, Goldfarb and Seibert. The tenth established a time limit for the initiation of the execution of the preceding two decretal paragraphs. The eleventh imposed a fine of $250 on each of the seven individual appellants and established a time limit for payment of those fines. The twelfth and last decretal paragraph directed that a copy of the order be served upon the county treasurer and county sheriff.
SPECIAL term’s MEMORANDUM DECISION
The appellants sought leave to reargue Special Term’s denial from the bench of their motion to dismiss the order to show cause and its rejection of a number of the procedural grounds upon which they had based their motion. Special Term granted such leave and then reaffirmed its rejection of those grounds upon the ground that they had all been considered and rejected in Yorktown Cent. School Dist. No. 2 v Yorktown Congress of Teachers (42 AD2d 422). It also rejected appellants’ attacks on the constitutionality of the Taylor Law, citing City of New York v De Lury (23 NY2d 175); City of Buffalo v New York State Public Employment Relations Bd. (80 Misc 2d 741) and City of Corning v Corning Police Dept. of Corning City Unit of Steuben County Chapter, CSEA, (81 Misc 2d 294) (cf. City of Amsterdam v Helsby, 79 Misc 2d 676). Special Term also rejected appellants’ contention that the September 2 temporary restraining order was null and void on the ground that Mr. Justice Aspland, in his memorandum decision of September 11, 1975 denying the appellants’ cross motion to dismiss, had established the law of the case, which was that the order was valid. Special Term next dealt with appellants’ claims that the September 12 show cause order was invalid as improperly pleaded, both as a civil and criminal proceeding, and rejected them, though it declared that, in order to *867 afford the appellants every possible constitutional safeguard, it would analyze the order to show cause and its underlying affidavit according to the standards of the Criminal Procedure Law. Doing so, it found that both the supporting affidavit for the September 12 show cause order, and the order itself, met all of the requirements of the applicable sections of the Criminal Procedure Law, as well as the requirements of section 757 of the Judiciary Law. It also rejected appellants’ attacks on the various specifications of the order, though it dismissed that part of Specification B2E which charged the individual appellants with harassing students and their parents because it was not supported by the allegations in the affidavit submitted by Superintendent Lyons as the basis of the show cause order. Special Term next discussed the hearings of September 29 and 30. It conceded the correctness of appellants’ contention that evidence in those hearings as to anything which took place after September 12, 1975, the date of the show cause order instituting the instant proceeding, could not be considered in connection with the court’s determination of whether the appellants were in contempt of court, because they had not received constitutionally sufficient notice thereof. However, Special Term declared that, while it had not considered such testimony in making the contempt determination, it had considered such testimony in determining the sanctions it had imposed, citing the Yorktown case (supra) as authority. Special Term also stated that it "took judicial notice, as bearing on the issue of sanctions, of Justice Aspland’s oral command to the * * * [appellants] on September 8, to return to work; of the preliminary injunction issued * * * on September 12; and of * * * [its] own oral command to the * * * [appellants] on September 18 to return to work.” Special Term then reviewed the testimony taken in the hearings before it with respect to the witness Pickus and found that the appellants Roseman, Cantoni, Goldfarb and Parker "each told him that they would keep the teachers out on strike”. But an examination of that witness’ testimony shows that Cantoni and Goldfarb said only "that the teachers would not return’5; that Parker indicated "that he could not ask the teachers to return until—if there was a settlement”; and that Mrs. Roseman "also indicated that the teachers would not return to work and indicated that she had taken them out proudly and that they would not go back without a contract or words to that effect.” With respect to the testimony of the witness Lyons, Special Term found that "he saw and heard striking teachers interfering with schoolchildren as they disembarked from school buses”. But the witness’ sole testimony on this point was: "I observed youngsters attempting to get off buses and substitutes attempting to get through picket lines. Scab stickers were being affixed to their automobiles. There was some screaming and shouting, name calling.” Special Term also found that the witness said Mrs. Roseman had "told him that 'all hell would break loose’ if the negotiations are not successful”. But the witness’ testimony was that the substance of what Mrs. Roseman said on the late evening of September 10 was "that I should do everything that I possibly could to end the negotiating process, to assist to end the strike or that 'all hell was going to break loose’, all hell would break loose.” In summarizing the credible testimony of the witness Lee, Special Term said: "He stated that the union’s Executive Committee had been advised by their prior attorney to stop the strike”. But the testimony of the witness Lee on this subject was as follows: "Q. Now, did you ever have occasion as a member of your Executive Board to talk to the attorneys who were representing you from Mr. Saunders’ office? A. Yes, I did. Q. And were you present at the time they gave an admonition to your Executive Board relative to your picketing activities? [Colloquy between the *868 court and the attorneys.] the court: Well, did you get any instructions from the former attorneys for the Association? the witness: Yes, I did. Q. And did they give you the admonition that had been given to them at the direction of Judge Aspland? A. Yes. Q. And was that admonition that you were to cease your strike activity? [Objection by appellants’ counsel and ruling thereon.] A. I can’t honestly recall what it was that he said. I don’t know if it was ceasing, the court: Did he say, 'Go back to work?’ the witness: No, this was not—when I appeared, I appeared as a representative of the Teachers’ Executive Board. At that first hearing when I was present there was a doubt in Judge Aspland’s mind as to whether the strike was, was going on and his decision came down on a Wednesday when I was not present. Q. Now, Mr. Lee, if you— the court: After that, did the lawyers, the former lawyers for the Union, tell you— the witness: They— the court: —to stop striking or words to that effect? the witness: No. mr. werner: Objection, the court: Overruled. Answer. Q. What did they tell you? A. Well, I was only present at the first hearing. Q. Mr. Lee, please. What did the lawyers tell you? You’ve told us that they gave you an admonition from Judge Aspland. Tell us what the lawyers told you. A. I believe they told me that at that time to curtail some of our activities on the picket line. Q. When was that? A. What date was that? Q. Yes. A. I’m not sure of the date. I think it was a Monday morning, September 3rd. I’m not sure. [Colloquy between court and counsel.] Q. When were you so advised by the attorney? A. Well, if I had a calendar, I could tell you. Do you have a calendar? the court: Well, it’s in small print. Maybe you can see better than I can. the witness: that’s all right. (Calendar shown to witness) the witness: September 8th; Monday, September 8th. Q. Were there others present at the time you were given this admonition? A. Other what? Other teachers? Q. Other members of your Executive Board? A. No. Q. You were by yourself? A. No. Q. Who was present? A. Other members of the Association. Q. And how many members of the Association were present? A. Four, including myself. Q. Were they members of the negotiating team? A. They were not. Q. And there were no members, no members of the Executive Board other than you present; is that correct? A. Yes, sir. Q. Where did this take place? A. In Riverhead, upstairs. Q. Oh— the court: You mean in the courthouse here? the witness: In the courthouse, Judge Aspland’s Court. Q. Is that the only time that the lawyers gave you any admonition from Judge Aspland? A. Yes, sir.” The foregoing clearly does not sustain Special Term’s finding that the union’s Executive Board had been advised by their prior attorney of Mr. Justice Aspland’s admonition to stop the strike. Finally, in its summary of the testimony, Special Term noted that the thrust of appellants’ witnesses’ testimony was solely to the effect that the petitioner board of education was guilty of not bargaining in good faith. As to this it held "that the plaintiff did not bargain in bad faith, nor did it engage in any other 'acts of extreme provocation as to detract from the responsibility of the employee organization for the strike’. (Jud. L. § 751(2)(a)),” adding that, in any event, even if the school board had negotiated in bad faith, "this would still not justify the teachers’ strike” citing Kuntz v Newburgh Teachers Assn. (75 Misc 2d 389). The Special Term failed to comment on the fact that appellants, in submitting their evidence, had stated that they were submitting it in mitigation. Rather, as it indicated in its opinion, in determining the severe sanctions it imposed upon appellants, it gave consideration to evidence of their conduct after September 12 and to activities for which it found they could not be held in contempt. In Kuntz (supra) the issue was whether the Board of Education of *869 the City of Newburgh was entitled to an injunction against a strike of the school teachers in the school district, not whether the claimed failure of the board of education to bargain in good faith could be considered in mitigation of sanctions to be imposed for violation of an order barring a teachers’ strike. Special Term’s opinion next stated the court’s view that paternal reprimands to public employee organizations striking in violation of the Taylor Law had proven ineffective and that the appellants "recognize no judge, no court and no law”, although it did not "believe that the entire rank and file membership condoned the unlawful strike, and especially the disgraceful conduct of a few strikers.” Finally, Special Term set forth the sanctions it was imposing and cited precedents to support its imposition of the substantial fines it was imposing on all of the appellants and for the jail sentences it was imposing on the individual appellants. To support its fine of $5,000 per day on the union for each of the 13 days of the strike, it cited Rankin v Shanker (23 NY2d 111); Yorktown Cent. School Dist. No. 2 v Yorktown Congress of Teachers (42 AD2d 422, supra); Matter of Board of Educ. of Cent. School Dist. No. 1 v Lakeland Federation of Teachers, Local 1760(65 Misc 2d 397); Board of Educ. of Clarkstown Cent. School Dist. No. 1 v Clarkstown Teachers Assn. (73 Misc 2d 349, mod on other grounds 42 AD2d 771). In support of its imposition of the 20-and 10-day jail sentences on the individual appellants, Special Term cited the Yorktown case (supra) and Board of Educ., Union Free School Dist. No. 23, Town of Oyster Bay v Massapequa Federation of Teachers (3 PERB fl 3-8014).
THE APPLICABLE LAW AND THE OPEEATIVE FACTS
I agree that Special Term’s rejection of appellants’ contention that the temporary restraining order of September 2 and the September 12 order to show cause initiating the criminal contempt proceeding, were both invalid for vagueness, was proper. Though both orders suffer from the defects of prolixity and repetitiveness, as Mr. Justice Aspland noted in his comments on the September 2 order, they are clearly and easily comprehensible to a reasonable man (see Metropolitan Funeral Directors Assn, v Zebrowski, 18 Misc 2d 303; Howard S. Tierney, Inc. v James, 269 App Div 348). Similarly, Special Term’s rejection of appellants’ attacks on the constitutionality of the Taylor Law was proper (see City School Dist of City of Schenectady v Schenectady Federation of Teachers, 49 AD2d 395, 397; Rankin v Shanker, 23 NY2d 111, supra; City of New York v De Lury, 23 NY2d 175; app dsmd 394 US 455, mot for leave to rehear den 396 US 872, supra; Central School Dist. No. 1 v Susquehanna Val. Teachers’ Assn., 43 AD2d 198, 200; City 'of New Amsterdam v Helsby, 37 NY2d 19). Nor do I find any merit in the appellants’ effort to establish technical defects in the order to show cause initiating the criminal contempt proceeding based upon claimed noncompliance with the requirements of sections 751, 752 and 757 of the Judiciary Law. I also reject appellants’ contention that it was error for Special Term, in determining what punishment was appropriate, to take into account conduct of the appellants occurring after the date of the show cause order of September 12. The foregoing does not, however, dispose of the matter, for the question still remains whether the punishment imposed was excessive. I pointed out that Special Term took judicial notice, as bearing on the issue of sanctions, of Mr. Justice Aspland’s oral command to the appellants on September 8, to return to work. But the record on appeal contains no evidence from which an inference could properly be drawn that any of the individual appellants ever received notice of that oral direction. It is well settled that actual knowledge of the issuance of a judgment or order is an indispensable element of a contempt proceeding (Orchard Park Cent. School *870 Dist. v Orchard Park Teachers Assn., 50 AD2d 462, 468; Puro v Puro, 39 AD2d 873, affd 33 NY2d 805; Shakun v Shakun, 11 AD2d 724). The order of September 8 was given to counsel representing the Teachers Association. Counsel informed Mr. Justice Aspland that he had conveyed his admonition to his clients. While this may be sufficient to sustain a finding of notice to the association, it cannot serve to establish notice to any of the individual appellants. Special Term was in error, therefore, in considering that order in assessing the punishment to be imposed upon them. The undisputed facts in the record also disclose that the petitioner school board and its negotiators made an offer of only 1.5% and sought to abandon a system of annual increments which would have meant an increase of 3.13%, an offer which it was well aware might result in a strike and which it refused to move from until the day before the teachers were to report for work for the new term. They persisted in this recalcitrance in the face of a recommendation by a fact finder, appointed by the Public Employment Relations Board, that the teachers be given an 8% increase, and a finding that such an increase would still leave the Half Hollow Hills teachers’ salaries well below the combined average salaries received by teachers in five neighboring school districts. They also engaged in tactics similar to those employed by private union-busting employers before the days of the Federal and State labor relations acts, of recruiting substitutes to work as teachers in the place of the members of the association and offering them higher than usual rates and signing them up in a manner which had to be seen by the association’s negotiators while negotiations were in progress. Their justification to the PERB-appointed fact finder for their refusal to offer more than a 1.5% increase, despite the fact that the approved school budget contained money for a 7% increase, was that salary increases beyond 1.5% would require tax increases, even though it was pointed out that a tax increase for a higher salary increase would leave the school district’s tax rates low relative to other comparable neighboring school districts. I emphasize those facts because I believe that they establish that, contrary to the finding of Special Term that the petitioner bargained in good faith, its conduct in negotiations was not in accordance with the following language of section 200 of article 14 of the Civil Service Law: "The legislature of the state of New York declares that it is the public policy of the state and the purpose of this act to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government.” Their conduct also violated the spirit, if not the letter, of the following language of section 209-a of the same article: "1. Improper employer practices. It shall be an improper practice for a public employer or its agents deliberately * * * (d) to refuse to negotiate in good faith with the duly recognized or certified representatives of its public employees.” While article 14 of the Civil Service Law is a legislative declaration against public employee strikes, the Legislature did not intend its ban to become a weapon which could coerce employee organizations into accepting unfair and inequitable agreements, or to compel them to accept substantial reductions in real wages, simply to allow the public employer to avoid further tax increases even though the local tax rate was relatively lower than those in comparable and neighboring districts. At the very least, Special Term should have considered these facts in mitigation in assessing the punishments it imposed on the individual appellants for their violation of the temporary restraining order. In this connection, section 751 (subd 2, par [a], cl [ii]) of the Judiciary Law provides that one of the factors to be considered by the court in fixing the amount of *871 the fine to be imposed as a punishment for a criminal contempt is "whether, if so alleged by the employee organization, the appropriate public employer or its representatives engaged in such acts of extreme provocation as to detract from the responsibility of the employee organization for the strike.” Here the appellant association offered evidence of provocation and the record makes it fairly inferable that the school district was "itching” for a strike because, despite the money it would have to pay to substitute teachers, it would come out financially ahead after the Taylor Law penalty was checked-off from the salaries of the striking teachers. Special Term should have taken those facts into consideration- in mitigation of the punishment which it imposed. One should not, and I do not, condone the appellant association’s conduct in violating the provisions of the temporary restraining order barring it from striking and picketing, and I therefore agree with my brethren that the fine assessed on the association may be sustained on the basis of those violations. However, in my opinion, the fines and prison sentences imposed on the individual appellants should be set aside for there is no evidence that they were responsible for the action of their members in striking or in voting for a strike at the early morning association meeting of September 2. It is highly relevant that a very large proportion of the teaching staff, 782 out of a total staff of 806, were dues paying members and that some 785 or 790 of the teachers went out on strike, but the record is barren of any evidence that any of the individual appellants urged them to vote for a strike. The only evidence that any of the officers of the association spoke to any member of the teaching staff to encourage him so to vote was Richard Lee’s testimony that he spoke to his department head for this purpose. Nor does the fact that Mrs. Roseman told a school official that, if there was not a settlement of the strike soon, "all hell will break loose”, do more than establish that she was anticipating or predicting what the teachers might do. In sum, it would appear that the animus of the board and the school district executives has centered on those individuals who, in the negotiations for a contract and to end the strike, were the persons they dealt with, but there is no evidence to establish that they, any more than the other striking members of the association, were responsible for the carrying on of the strike. Rather, the evidence is that during the strike there were frequent well attended membership meetings in the afternoon hours, after 4:00 p.m., of all of the school teachers. My analysis of the record compels me to conclude that it contains no evidence of special culpability on the part of the individual appellants, who comprise all but two of the members of the executive board of the association plus the members of its negotiating team. In addition, in my opinion, the conduct of the board of education was deliberately designed to promote a strike. Hence, I would modify the judgment by deleting from it those paragraphs which impose fines of $250 and terms of imprisonment on each of the individual appellants.