Vincent A. Lupiano, J.
The plaintiff, New York City Transit Authority, sues for an injunction restraining the defendant Motormen’s Benevolent Association, Inc. and the individual defendants, who are either officers, committeemen or members *735 of the association, as well as all other persons employed by the plaintiff under the title “ motorman ”, from striking or instigating, promoting or carrying on a strike or other work stoppage. It has moved for an injunction pendente lite. The defendants have cross moved for an order dismissing the complaint for insufficiency on its face, and for other forms of relief; among other things, the defendants would have this court enjoin the plaintiff, during the pendency of this action, from recognizing the Transport Workers’ Union as the exclusive union representative for the motormen and from failing to recognize the Motormen’s Benevolent Association as such exclusive union representative. The defendants also apply for an injunction pendente lite against the enforcement by the plaintiff of the so-called Condon-Wadlin Act (Civil Service Law, § 22-a) and restraining the plaintiff from maintaining disciplinary proceedings thereunder against the motormen. This application for relief during the pendency of the action is predicated upon a counterclaim in defendants’ amended answer upon the basis of which they hope to win a permanent injunction after trial. At the argument, counsel for the respective parties were in agreement that an early trial is desirable. However, the respective applications for injunctions pendente lite require immediate determination and they have been considered together.
The complaint refers to section 22-a of the Civil Service Law, and it is alleged that the defendants are urging motormen to strike and thereby violate that law for the purpose of inducing, influencing or coercing the plaintiff into recognizing and dealing with the defendant association as the bargaining agent of its members. The complaint further pleads a cause of action under common law, outside the statute, for injunctive relief also, on the ground that the plaintiff is a governmental agency performing a governmental function in carrying out its corporate purpose by operating the transit facilities owned by the City of New York for the benefit of the City and State of New York. Plaintiff alleges that such a strike against the plaintiff is a strike against the public and that if the defendants are not restrained from resuming this strike irreparable damage to the plaintiff and the general public will result.
Subdivision 2 of section 22-a of the Civil Service Law reads: “No person holding a position by appointment or employment in the government of the state of New York, or in the government of the several cities, counties, towns or villages thereof, or any other political or civil division of the state, or of a municipality, or in the public school service, or in any public or special district, or in the service of any authority, commission, *736 or board, or in any other branch of the public service, hereinafter called a ‘ public employee, ’ shall strike. ’’
In other subdivisions, the word ‘ ‘ strike ’ ’ is defined; sanctions and penalties are prescribed and certain procedure for redress is stated. The defendants question the constitutionality of the said Condon-Wadlin Act.
It appears from the complaint and also the court may take judicial notice that the plaintiff is a public benefit corporation created by the Legislature (L. 1953, ch. 200, as amd.; Public Authorities Law, § 1800 et seq.) for the purpose of acquiring and operating the transit facilities owned by the City of New York. The statute provides that in the operation of such facilities the Authority is to be regarded as performing a governmental function for the benefit of the people of the City of New York (Public Authorities Law, § 1802; cf. § 1815) and the Authority is specifically empowered “ To do all things necessary or convenient ” to effectuate its purposes and for the exercise of its broad powers with respect to the management and maintenance of the New York City Transit System (Public Authorities Law, § 1804, subd. 16). The plaintiff has alleged that in the maintenance and operation of its facilities, it employs approximately 35,000 persons who are paid by the hour and all of whom hold positions by appointment or employment under the Civil Service Law and are public employees (cf. Public Authorities Law, §§ 1804, 1810). There are well over 3,000 subway motormen who consider themselves, properly I think, a separate craft.
I have concluded from the affidavits before me that an injunction should issue continuing in effect the temporary stay now outstanding, and restraining the defendants, during the pendency of this action, from instigating, promoting or carrying on a strike. The papers submitted to me establish that there is imminent danger of a strike by motormen which would prevent the operation of plaintiff’s rapid transit lines carrying millions of passengers each weekday.
That there is such immediate danger of a strike by these defendant motormen, and therefore a pressing need for an injunction pendente lite, is demonstrated by a narration of the following events which have occurred. The defendant Loos, who is president of the defendant association, made an address over radio station WLIB on the evening of June 10, 1956, and publicly said that the defendant association had determined upon a strike of subway motormen on June 20, 1956. On June 12 the plaintiff Authority received the following telegram purporting to come from the defendant association, which does not *737 disclaim responsibility for it: “ We have tried unsuccessfully to avoid this action. Denial of a conference has brought about the following reaction. On June 20, 1956, at 12:01 a.m. the motormen of the transit system shall go on strike. The officers and committee is obliged to support this action to a successful conclusion. M. B. A. Officers and Committee.” Also, the defendants printed and affixed to various cars and stations of the transit system the following notice: “ Strike — To the Biding Public. The Biding Public and the Motormen of the New York City Transit Authority are in the same boat. We have no voice in the Transit Authority. We have bent every effort, sincerely and honestly, to bring about a peaceful solution. We have done everything humanly possible to gain an audience with the Transit Authority and the Mayor of the City of New York. A stubborn Transit Authority says, ‘ The law is on our side, what are you going to do about it? ’ We have tried the democratic way * * * the American Way. We have no other recourse. In any action that follows we ask your forbearance and cooperation. The Subway Motormen.”
On June 14, 1956, there actually was a strike, which began in the early afternoon and lasted well into the evening hours. This occurred without warning or notice to the plaintiff or to the public. By early evening the entire subway system was crippled and danger and damage were thus brought to the inhabitants of the city. Indeed, the memory of that day is still fresh in the minds of innumerable persons who were affected. This brief strike showed all too plainly what a dreadful public disaster a well-organized and effective strike of even a few days’ duration would be.
The operation of rapid transit facilities in the city of New York is properly and necessarily a governmental function. Therefore, those employed in that vital service, like police officers and members of the fire department, may not strike. The defendants deny that the operation of such rapid transit facilities is properly a governmental function. But this is not the nineteenth century and the City of New York is not a horse and buggy town. Most of its inhabitants are separated from their work by many miles and sometimes by several waterways. If the subways be unavailable to them, then in order to get to their jobs and to perform other necessary duties, they will have to travel, as best they can, on narrow, traffic-choked streets and over bridges and through tunnels which can hold only so many vehicles at a time. All essential services would soon be disrupted ; those who work to supply the people with food and other necessities of life, the police who guard us against crime and *738 disorder and the men who protect us in case of fire, to say nothing of doctors, nurses, pharmacists and countless other indispensable workers, would be unable to reach their appointed places of duty. Indeed, a recent disruption of service on but one or two subway lines, between the Grand Central station and the Brooklyn Bridge station, occasioned by the Wanamaker fire, created such conditions of hardship and danger as to give further warning of what a total subway strike would mean for the people of the city of New York.
It is easy to forget, while the subways are running, that there is room for motor vehicles on the streets only because millions travel by subway; for if all persons had to use surface transportation, the bridges and tunnels and main highways would soon be hopelessly clogged. New York with its immense territory and its five separate boroughs, all protected by unified police and fire departments and having many other integrated services, is dependent for its very life and daily functioning, and for the immediate safety of its 8,000,000 inhabitants, on rapid transit facilities which are necessarily used by nearly all persons engaged in all of its governmental and other vital functions. "Whatever may be the case elsewhere, and under other conditions, whatever may have been the case in other times, here and now, and for this city, the operation of the rapid transit facilities is a basic governmental service indispensable to the conduct of all other governmental as well as private activities necessary for the public welfare. It is worth re-emphasizing that the subways are the city’s arteries upon which its life and daily living depend. If these subway employees were permitted to strike, they would, in effect, be striking against themselves and against their own families, who also are among the city’s people.
As the late President Franklin D. Roosevelt remarked in a letter dated August 16, 1937, written to the president of the National Federation of Federal Employees: “ Upon employees in the federal service rests the obligation to serve the whole people, whose interests and welfare require orderliness and continuity in the conduct of government activities. This obligation is paramount. Since their own services have to do with the functioning of the government, a strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of government until .their demands are satisfied. Such action, looking toward the paralysis of government by those who have sworn to support it, is unthinkable and intolerable.” The late Mayor Fiorello H. LaGuardia *739 also wrote in a letter to the then chairman of the Board of Transportation: “ The City does not and cannot recognize the right of any group to strike against the City ” (Rhyne on Labor Unions & Municipal Employe Law, p. 383). Indeed, on this point there seems to be unanimity among leaders of public action and thought.
Moreover, this court is bound to give effect to the legislative declaration that in the operation of its facilities the Transit Authority is performing a governmental function (Public Authorities Law, § 1802), for such a declaration, unless it be arbitrary, unreasonable or contrary to the plain facts, establishes the public policy of the State. Even if the court held a view opposed to that of the Legislature as to what constitutes the better public policy, it would nevertheless be obliged to apply the public policy laid down by the Legislature unless it were clearly unreasonable to do so, as clearly it is not.
Defendants nevertheless insistently press their contention that in operating the rapid transit system the plaintiff is engaging in a proprietary function of government and one which is not essentially governmental in character. Apart from and besides what I have already said on this point it seems to me further that the traditional distinction between governmental and proprietary functions is somewhat outworn. This was largely developed for tort actions against municipalities, and to prevent cities, in civil suits against them, from escaping responsibility for the negligence of their employees by taking refuge in the defense that there can be no civil liability by a city for governmental acts, that is, for the acts of its employees engaged in performing a governmental function. Such distinctions between governmental and proprietary functions are no longer necessary where there are statutes, and there are now many such, making municipalities liable for wrongful acts of police, firemen and others performing the purest governmental services within the strictest meaning of the phrase. In any event, in the context of the situation in hand, a distinction between governmental and proprietary functions is wholly inapposite (cf. City of Los Angeles v. Los Angeles Bldg. & Constr. Trades Council, 94 Cal. App. 2d 36).
Because there is an imminent danger, a clear and present danger, of a strike against the public interest, by public employees engaged in a governmental function, it is not necessary to rest the plaintiff’s right to an injunction pendente lite solely upon the Condon-Wadlin Act. This court is of the conviction that absent statute it would nevertheless have the power *740 and the duty to enjoin a strike which would wreck so essential a governmental service as that which is represented by this city’s rapid transit facilities (cf. United States v. Mine Workers, 330 U. S. 258; Norwalk Teachers’ Assn. v. Board of Education, 138 Conn. 269; City of Cleveland v. Division 268 of Amalgamated Assn., 90 N. E. 2d 711 [Ohio]; International Brotherhood v. Grand River Dam Auth., 292 P. 2d 1018 [Okla.]; City of Los Angeles v. Los Angeles Bldg. & Constr. Trades Council, supra; and see Jewish Hosp. of Brooklyn v. “ John Doe ”, 252 App. Div. 581).
However, the court is also under the necessity of giving effect to the Condon-Wadlin Act, by which the Legislature unquestionably made it the public policy of this State that there be no strike by public employees including those “ in the service of any authority.” Defendants argue that the act is unconstitutional but I cannot agree, and I do not believe, that this argument will find acceptance if directed against this statute as a whole (cf. Detroit v. Division 26 of Amalgamated Assn., 332 Mich. 237; see, also, Butler v. Monaghan, 200 Misc. 327; indeed, an assumption of constitutionality appears to be implicit in Matter of Durkin v. Cheek, 283 App. Div. 683). Bead broadly, the Condon-Wadlin Act is an embodiment of views long held by executive and judicial branches of government, both State and Federal, and is compatible with the inherent sovereign power delegated to the Legislature to prevent strikes by public employees which would interfere with the regularity and continuity of governmental functions. It may be that as to certain of its applications, in specific situations, strict and literal enforcement of some provisions of the Condon-Wadlin Act may have consequences which courts may find to be unreasonable or a deprivation of due process and hence unconstitutional. But with these possibilities, if and when they arise and with whatever impact they may have on some provisions of the act, I cannot now concern myself. In the present circumstances, before actual impairment by administrative action is clearly demonstrated, judicial interference would be premature. In any event, I cannot say that the implication deriving from the statute that it is against public policy for public employees to strike, and the provisions thereof prohibiting such strikes, are unconstitutional insofar as these rapid transit motormen are concerned, any more than they would be unconstitutional in relation to the police force and to firemen. Nor have I, as I have already suggested, the right to pass upon the wisdom of the Condon-Wadlin Act and of its divers provisions. If it be too harsh in some respects, providing only sanctions and penal *741 ties with no correlative safeguards for faithful public servants, this court is nevertheless not free to disregard the legislative mandate.
However, I think it worth noticing that, in approving the Condon-Wadlin Act, the then Governor of the State of New York said, among other things, apparently offering this as a reason why public employees never have the need to strike: “ Public employees have the right to improve their conditions through arguments before all the people, before legislative bodies, to administrative officials and, of course, by their own ballots on election day. These rights are so effective that among all the types of employment over the years public employment has been rated as having the best and most desirable conditions ”. This reason, as thus stated, appears to me to be less applicable to employees of a public authority than to those whose working conditions, wages, etc. are fixed by elected officials such as a governor, a mayor, or their immediate subordinates directly responsible to them, or by a legislature, board of supervisors or board of estimate. A public authority, such as the Transit Authority, is at least semi-áutonomous, that is, without steady or strong outside control. It has only a second-hand or diluted responsibility or accountability to the electorate. The persons constituting its management have no superiors and yet do not themselves at any time have to come before the voters, who at best exercise only a kind of remote control over them. Such an authority, however well intentioned it may be, tends to grow arbitrary in its dealings with the public and with its employees. Its very freedom from direct and constant accountability is apt to bring about this consequence. Nothing which has been said in this opinion is to be construed or interpreted as being in the least degree directly or impliedly critical of the present Transit Authority. My observations are of a general nature and not directed against any specific Authority or individuals.
Thus, the Transit Authority, although only indirectly answerable to the people, may but need not, under existing law, engage in collective bargaining with its employees or accord to them any of the rights which are now universally accepted as belonging to labor. It should be noted here that the collective bargaining agreement, effective July 1, 1954, was the outcome of recommendations incorporated in a report made by the New York City Transit Fact-Finding Committee appointed by the Mayor of the City of New York in January, 1954 to investigate and report on the issues in dispute between the New York City Transit Authority and its employees and the various labor organizations representing them, as a result of the expiration *742 of the Memorandum of Understanding theretofore entered into and adopted by the parties. The agreement followed not because the Transit Authority was compelled to bargain but because need for harmonious and stabilized transit operations wisely dictated this policy.
It seems to me that it would be well if employees of a public authority were not left, as they now are, largely at the mercy of the authority which employs them and at the same time in the grip of the Condon-Wadlin Act. Deprived as they are of the right to strike, even of the right to compel recognition of any labor organization which may represent and undertake to speak for them, there should be statutory provision, in case of a dispute between labor employed by and the management of a public authority, for the ultimate determination of wages, hours, working conditions, etc. by a responsible and competent governmental agency wholly outside of and beyond the control of the employing authority. Perhaps methods of mediation similar to those applicable to railroads operating in interstate commerce could be devised. I am informed that over 90% of all disputes submitted to voluntary mediation in this State are amicably adjusted without a strike or other work stoppage. The force of public opinion is such that all parties to these mediations tend to accept the recommendations of the mediating agency even when such recommendations are not legally enforcible. That is because it is generally recognized that the appointed mediators have acted fairly and impartially after an objective consideration of the submitted controversy. These remedial suggestions by the court are, of course, tentative only and are offered with the hope that they will help to stimulate constructive thinking by others better qualified to deal in a practical way with these problems in labor-management relationships involving public authorities.
The procedural requirements of section 876-a of the Civil Practice Act have no application to these public employees. Also, the individual defendants plainly have no rights under the State Labor Relations Law for section 715 of the Labor Law specifically provides that such act shall not apply to public employees generally (cf. Jewish Hosp. of Brooklyn v. “ John Doe ”, 252 App. Div. 581, supra; Petrucci v. Hogan, 27 N. Y. S. 2d 718; Westchester County v. Westchester County Federation of Labor, 115 N. Y. S. 2d 144; 129 N. Y. S. 2d 211; see, also, White v. Boland, 254 App. Div. 356).
What has already been said indicates the conclusions I am constrained to reach with respect to defendants’ application for an order (1) dismissing the complaint for insufficiency and *743 (2) enjoining the plaintiff Authority from recognizing the Transit Workers’ Union as the exclusive union representative of the motormen and from refusing to recognize the defendant Motormen’s Benevolent Association as such exclusive union representative, or in the alternative requiring an election to be held to determine which group is to be the union representative of the motormen. The hard-won legal right of labor to compel recognition by employers of majority union representation is rooted in statute. At common law labor had few rights. Elections to determine union representation are provided for and guaranteed by statute only. As already observed, the Labor Relations Law of this State is the instrument which gives certain rights and benefits (including the ones discussed herein) to labor in the employ of private industry, but it specifically excludes employees of the State or of any political or civil subdivision or other agency thereof, such as the plaintiff, from these statutory rights and benefits. Nor can the extension of the original collective bargaining agreement provide the basis for such rights. Obviously, this court is not free to legislate in behalf of these defendants and it follows that the injunctive relief hereinabove described and sought by them must be denied.
Clearly, at this time I may not enjoin the plaintiff, as the defendants would have me do, from maintaining disciplinary proceedings under the Condon-Wadlin Act. As I have already indicated, if its application in a particular instance should result in a deprivation of due process or of any other of the guaranties of the Bill of Rights, the individual affected may then seek redress in court. As added reason for restraint, defendants urge that the plaintiff has violated certain of its own rules and regulations. If so, the impact and consequences thereof should be explored at the trial as no clear reason appears for granting temporary relief in that connection. I may not at this time, or in this way, restrain the Transit Authority pendente lite from managing and conducting the rapid transit system in accordance with the powers given to it by law.
A further thought: Even assuming that this court had the power to require the plaintiff to recognize one union rather than another, which I think it does not have, at least absent firm contractual commitment, it could not now make a ruling with respect to the rights of the Transit Workers’ Union, which is not presently a party to this suit and therefore not bound by any determination which may now be made, although it has been permitted to file a brief as amicus curice, which brief, like the fair and learned briefs submitted by counsel for the plaintiff and by counsel for the defendants, has been most helpful to this *744 court. The Transit Workers’ Union is, of course, free to make a formal motion for leave to intervene as a necessary or proper party, and any party already in the action may likewise move to join it.
In conclusion: The complaint is sufficient on its face. Whether the counterclaim is sufficient on its face I do not determine because no motion directed to its sufficiency has been made. The counterclaim will not be severed from the main action and the defendants will not be remitted to a separate suit with respect to the matters pleaded therein. The plaintiff’s motion for an injunction pendente lite is granted. The defendants’ cross application for various forms of relief is denied. The case is set down for an early trial, and for that purpose, upon due service and filing of a note of issue, is directed to be placed at the head of the proper ready calendar for September 10, 1956, to be assigned on that day for immediate trial.
Settle, within three days, one order for both motions.