Phillip A. FEASTER, et al., Appellants,

v.

Paul L. VANCE, et al.   Appellees.

No. 00–CV–685.

District of Columbia Court of Appeals.

Argued April 26, 2001.
Decided Oct. 2, 2003.

Jonathan G. Axelrod, with whom John R. Mooney and Richard W. Gibson were on the brief, Washington, DC, for appellants.

Anthony Herman, with whom Robert J. Lundman, Washington, DC, was on the brief for appellee Paul L. Vance. Robert R. Rigsby, Corporation Counsel at the time, and Charles L. Reischel, Deputy Corporation Counsel at the time, were on the brief for appellee District of Columbia.

Before FARRELL, GLICKMAN and WASHINGTON, Associate Judges.

GLICKMAN, Associate Judge:

The Superintendent of the District of Columbia Public Schools ("DCPS") and the District of Columbia filed suit in Superior Court against appellants, two Teamsters Union locals and their presidents, to enjoin an unlawful strike by school employees. After holding an evidentiary hearing, the court entered a preliminary injunction against the threatened strike. This appeal followed.[1] Appellants contend that the Superior Court lacked jurisdiction to grant injunctive relief, either because the Public Employee Relations Board had exclusive jurisdiction over the complaint in its entirety or because the federal Norris–La-Guardia Act barred the Superior Court from issuing an injunction against a labor strike. Alternatively, appellants contend that the court abused its discretion in granting injunctive relief. They argue that a strike by DCPS employees is not an unlawful strike "against the District." Appellants further argue that an injunction was unwarranted because the threatened strike would not have caused irreparable injury and because the DCPS had failed to bargain in good faith and hence had "unclean hands."

We reject appellants' contentions. We hold that the looming school employee strike was prohibited by law, the Superior Court had jurisdiction to enjoin the strike at the behest of the Superintendent of Schools and the District of Columbia, and the court did not abuse its discretion in granting preliminary injunctive relief.

I.

Teamsters Local 639[2] and Teamsters Local 730[3] are the Board-certified exclusive bargaining agents for food service workers, bus drivers, bus attendants, custodians, and engineers employed by the District of Columbia Public Schools. These workers provide services to some 70,000 public school children in the District. The two Teamsters locals bargain jointly with the DCPS and are covered by the same collective bargaining agreement. The Teamsters' chief labor negotiator and spokesperson, appellant Phillip A. Feaster, is Local 639's President.

In 1996 the Teamsters and DCPS commenced negotiations over a collective bar-

---

1. An order granting a preliminary injunction is appealable immediately. *See* D.C.Code § 11–721(a)(2)(A) (2001).

2. Drivers, Chauffeurs and Helpers Local Union No. 639 is affiliated with the International Brotherhood of Teamsters, AFL–CIO.

3. Like Local 639, Warehouse Employees Local Union No. 730 also is affiliated with the International Brotherhood of Teamsters, AFL–CIO. Appellant Richard Dade is the President of Local 730.

gaining agreement for the years 1996 to 1999. The parties negotiated intermittently without success. After a lengthy hiatus, the Teamsters and DCPS agreed to resume active negotiations after school opened in September 1999. The central dispute in the negotiations at that time was over the issue of economic "parity" between the Teamsters and two other DCPS bargaining units, which were known as Compensation Units I and II. Under the rubric of parity, the Teamsters demanded the same bonuses and pay raises for their employees that the employees in Compensation Units I and II had received in their separate labor negotiations. The DCPS did not agree to the Teamsters' demands.

By December 1999 there was talk of a strike over the parity issue. On December 7, appellant Feaster sent the Superintendent of Schools a letter by certified mail in which Feaster reiterated the Teamsters' call for parity and requested a meeting. The letter warned that the unions might have to "resort to the action we were going to take in 1997 which would have caused serious disruption to the DCPS System." The Superintendent understood this as a strike threat. Feaster met with the Superintendent on January 10, 2000, and emphasized that there would be a "problem" if the Teamsters' monetary demands were not met. When they met again, on January 14, Feaster told the Superintendent that there would be "a serious disruption to the school system" unless the DCPS agreed to the Teamsters' demands. Two days later, the members of the two Teamsters locals convened and voted by 470 to 4 in favor of a strike. Feaster reported the strike vote to the Superintendent. On January 19 the Superintendent told Feaster that the DCPS was making progress on the question of a bonus but that there were no funds available for wage increases. Feaster responded that the strike

would be deferred but there would be a "serious work stoppage" on Monday, January 24, if an agreement was not reached by then.

On January 21, the Superintendent of Schools and the District of Columbia filed their complaint in Superior Court to enjoin the Teamsters from engaging in an unlawful strike. The court issued an agreed-upon temporary restraining order that same day. With the parties' further consent, the restraining order was extended to permit the court to hear and decide the plaintiffs' motion for a preliminary injunction. While the temporary restraining order was in effect, Teamsters officials distributed to parents at a Public Schools Enrollment Fair a leaflet that outlined the Union's grievances and predicted that the Superintendent of Schools "will cause major chaos in the school system by forcing workers to strike."

Superior Court Judge Joan Zeldon held an evidentiary hearing on the motion for a preliminary injunction on February 28. On April 12, Judge Zeldon granted the motion and issued an order enjoining the Teamsters from "in any manner, calling, continuing, encouraging, aiding or otherwise participating in any strike or other job action, including, without limitation, any work stoppage, slow down, sick-out or 'work to the rule' action or any other job action, ... or otherwise interfering with or affecting the functioning of the District of Columbia Public Schools." Along with that order, Judge Zeldon issued a separate memorandum opinion in which she addressed and disposed of the Teamsters' jurisdictional and other arguments and explained the basis for her ruling.

Judge Zeldon began her analysis of the issues by determining that the plaintiffs had shown a substantial likelihood of success on the merits because a strike by

DCPS employees would violate the prohibition against strikes by District government employees set forth in D.C.Code § 1–617.05 (2001),[4] as well as a Board of Education regulation and the Teamsters' contractual obligations. Judge Zeldon rejected the Teamsters' argument that the Superior Court was divested of jurisdiction by virtue of the fact that a public employee strike would be an unfair labor practice within the primary jurisdiction of the Public Employee Relations Board. *See* D.C.Code § 1–617.04(b)(4) and § 1–605.02(3). The plaintiffs were not required to go to the Board to enforce the prohibition in D.C.Code § 1–617.05, Judge Zeldon reasoned, "because [that statutory provision] is independent from the unfair labor practice provisions over which [the Board] has jurisdiction." Judge Zeldon also rejected the argument that injunctive relief against the Teamsters' strike was barred by the Norris–LaGuardia Act. The general prohibition against labor injunctions contained in that Act, Judge Zeldon held, does not apply to injunctions against strikes by public employees. On the merits of the request for a preliminary injunction, Judge Zeldon found—in addition to the requisite likelihood of success on the merits—that a

strike would result in irreparable harm by causing a substantial disruption in the education of children in the public schools.[5] The judge further found that more harm would result from denying the injunction than granting it [6] and that the public interest would be served by granting the injunction. Finally, Judge Zeldon rejected the Teamsters' contention that the DCPS should be denied injunctive relief because of "unclean hands." The judge noted that the Teamsters had not charged the DCPS with failure to bargain in good faith by filing an unfair labor practice charge with the Public Employee Relations Board.

The Teamsters appealed the preliminary injunction order to this court. Meanwhile, we are informed, the parties continued with their negotiations. Neither side in the negotiations declared an impasse or filed an unfair labor practice complaint against the other. Neither side, however, has notified this court that the parties have resolved their differences and come to an agreement that would have mooted the issues before us.

## II.

We address first appellants' jurisdictional challenges. Those challenges

---

4. At the time of the hearing in this case, the prohibition was codified at D.C.Code § 1–618.5 (1999). In this opinion we shall, for the reader's convenience, cite to the current (2001) codification of relevant statutory provisions.

5. Judge Zeldon made the following factual findings, none of which are challenged on appeal:

There would be an immediate impact on five high schools, attended by 5700 children, that probably would close. . . . Fifteen hundred "special needs" children who attend 109 schools in Maryland and Virginia would be deprived of normal transportation by DCPS. . . . There is a real danger that 5000 teachers would refuse to cross the picket line, resulting in widespread disruption of efforts to keep schools open. . . . In

the absence of cafeteria workers, children who normally receive two meals at school would be deprived of this regular source of food. . . . Many school children of working parents probably would be out in our community without adult supervision. . . . It is likely that some or all of the before school, after school and athletic programs available to school children through DCPS would shut down. . . .

6. "[G]ranting the injunction," Judge Zeldon stated, "will preserve the status quo while the parties engage in collective bargaining and the children continue to go to school, receive meals there, and participate in the athletic and other before school and after school programs they normally attend."

raise issues of statutory construction, and hence the trial court's rulings are subject to *de novo* review in this court. *See Cass v. District of Columbia*, 829 A.2d 480, 482 (D.C.2003); *District of Columbia v. Morrissey*, 668 A.2d 792, 796 (D.C.1995). As we uphold the Superior Court's authority to hear this case and its power to grant injunctive relief, we then address appellants' remaining challenges to the trial court's ruling. We review the trial court's decision in favor of granting a preliminary injunction for abuse of discretion. *See District of Columbia v. Group Ins. Admin.*, 633 A.2d 2, 21 (D.C.1993).

### A.

In 1978 the Council of the District of Columbia enacted the Comprehensive Merit Personnel Act ("CMPA"), D.C.Code §§ 1–601.01 *et seq.* (2001), "to replace the federal system which had previously controlled the District government's relations with its employees." *Hawkins v. Hall*, 537 A.2d 571, 574 (D.C.1988). The CMPA contains two separate provisions prohibiting strikes by District government employees. One of those provisions, D.C.Code § 1–617.05, declares that "[i]t shall be unlawful for any District government employee or labor organization to participate in, authorize, or ratify a strike against the District." The other provision, D.C.Code § 1–617.04(b)(4), makes it one of a number of specifically prohibited unfair labor practices for District government employees to engage in a strike or for their union to condone a strike.[7]

The CMPA commits the responsibility to resolve allegations of unfair labor practices to the Public Employee Relations Board. *See* D.C.Code § 1–617.02(b)(2). The Board is empowered to hold evidentiary hearings and "[d]ecide whether unfair labor practices have been committed and issue an appropriate remedial order." D.C.Code § 1–605.02(3), (7), (8). The Board may issue "orders which ... compel a labor organization or the District to desist" from prohibited conduct, D.C.Code § 1–617.13(a) (2001), and may request the Superior Court to enforce those orders. *See* D.C.Code § 1–617.13(b). Any person aggrieved by a final order of the Board may obtain review in Superior Court. D.C.Code § 1–617.13(c).

In light of these statutory provisions clearly committing unfair · labor practice questions to the Public Employee Relations Board in the first instance, we held in *Hawkins* that the Board "has primary jurisdiction to determine whether a particular act or omission constitutes an unfair labor practice under the CMPA." 537 A.2d at 574. We further held that plaintiffs ordinarily must exhaust their administrative remedies with the Board before they may seek relief on arguable unfair labor practice claims in Superior Court. *Id.* at 573, 575 n. 8. The plaintiffs in *Hawkins* were Board of Education employees who charged that the Board had unlawfully withheld union dues from their wages after their collective bargaining agreement had expired. In rejecting the argument that the Superior Court could exercise concurrent jurisdiction with the Public Employee Relations Board (PERB)over the employees' claim, we emphasized that the Council "has revealed no such intent":

> Nowhere in the CMPA can we find any language reflecting a desire, or even an

---

7. In pertinent part, D.C.Code § 1–617.04(b)(4) provides that "[e]mployees, labor organizations, their agents, or representatives are prohibited from ... [e]ngaging in a strike, or any other form of unauthorized work stoppage or slowdown, or in the case of a labor organization, its agents, or representatives condoning any such activity by failing to take affirmative action to prevent or stop it...."

acquiescence, on the part of the Council to allow suits such as this to be brought in the Superior Court when the PERB plainly has subject-matter jurisdiction. Without a showing of such legislative intent, appellants cannot prevail.

*Id.* at 574. Subsequent cases in this court have made it clear, moreover, that where the Board has primary jurisdiction over a claim, a plaintiff cannot "bypass" the Board by arguing that the complaint also asserts a common law cause of action such as breach of contract. *See Cooper v. AFSCME, Local 1033,* 656 A.2d 1141, 1144 (D.C.1995) (involving a claim that the defendant union had breached its duty of fair representation).

Relying on *Hawkins* and *Cooper,* appellants argue that since a strike by D.C. government employees is an unfair labor practice, the PERB is vested with primary jurisdiction over the complaint in this case and the Superior Court was without jurisdiction to proceed on it. Judge Zeldon rejected that argument on the ground that the Superintendent of Schools and the District of Columbia invoked a prohibition against strikes in the CMPA that is independent of the statutory unfair labor practice provisions.

■ We agree with Judge Zeldon. Under D.C.Code § 11–921(a) (2001), the Superior Court is a court of general jurisdiction "with the power to adjudicate any civil action at law or in equity involving local law." *Martin v. District of Columbia Courts,* 753 A.2d 987, 991 (D.C.2000) (quoting *Powell v. Washington Land Co.,* 684 A.2d 769, 770 (D.C.1996)). "[U]nless a contrary legislative intent clearly appears," *Martin,* 753 A.2d at 991, the Superior Court has jurisdiction over a claim that

employees of the District government are violating or about to violate D.C. law by going on strike. Unlike in the case of other unfair labor practices, such a "contrary legislative intent" does not "clearly appear" with respect to the subject of public employee strikes. The Council has not manifested its intent to commit complaints about such strikes exclusively to the PERB for initial resolution. Rather, by enacting D.C.Code § 1–617.05 as an independent statutory prohibition, the Council manifested its intent to enable the District government to go directly to Superior Court to enjoin strikes by public employees.

■ It is indeed noteworthy that the CMPA contains not one but two provisions prohibiting strikes by government employees, only one of which bans them as unfair labor practices. The second provision, a categorical declaration that such strikes are unlawful, is outside the unfair labor practice framework and makes no reference to enforcement through the PE RB.[8] Other unfair labor practices do not receive such redoubled statutory attention. We are loath to construe the second provision as mere surplusage. Rather, "[w]e must be 'especially mindful,' in interpreting the CMPA as a whole, that 'each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." ' *Council of the District of Columbia v. Clay,* 683 A.2d 1385, 1392 (D.C.1996) (quoting *Morrissey,* 668 A.2d at 798, and *Thomas v. District of Columbia Dep't of Employment Servs.,* 547 A.2d 1034, 1037 (D.C. 1988)). We therefore must ask what different purposes the two statutory provisions, § 1–617.04(b)(4) and § 1–617.05,

---

8. In contrast, where the CMPA elsewhere establishes standards of conduct for labor organizations, such as the holding of fair elections, the statute specifies that complaints of violations shall be filed with the Board. *See* D.C.Code § 1–617.03(c); *see also Cooper,* 656 A.2d at 1143.

may serve. By prohibiting public employee strikes as unfair labor practices, the former provision subjects them to the jurisdiction of the PERB. What does the latter provision add by separately declaring such strikes to be "unlawful"? It is not suggested that § 1–617.05 criminalizes strikes by employees of the D.C. government. The statute provides no criminal penalty. Nor (unlike comparable statutes in other jurisdictions) does § 1–617.05 specify non-criminal penalties such as payroll deductions. If § 1–617.05 does not furnish a basis on which the D.C. government may apply directly to the Superior Court for relief against an unlawful strike by its employees, it is difficult to see what purpose § 1–617.05 serves.

On the other hand, the availability of a direct action in Superior Court to enjoin an unlawful public employee strike as an alternative or supplement to an unfair labor practice complaint in the PERB furthers the public policy embodied in the CMPA and is not duplicative. When an illegal strike by government employees that may threaten serious harm to the public is imminent or already under way, time may be of the essence in effectuating the statutory policy. Relief may be delayed if the District government can proceed against the strike only by way of an unfair labor practice complaint before the Board, for the Board must first investigate and decide the merits of the complaint, then decide upon a remedial order, and then apply to the Superior Court to enforce its order if the strikers are recalcitrant. To be sure, the Board may act expeditiously and may request the Superior Court to enforce an order for interim relief. *See*

D.C.Code § 1–617.13(b). In an injunctive action filed at the outset in Superior Court, however, the court is able to act immediately to prevent or halt an illegal strike and protect the public interest. Moreover, the issue before the Superior Court in an action for injunctive relief is comparatively narrow—the court is not called upon in such an action to intrude on the Board's area of labor relations expertise and usurp the Board's discretionary authority to choose among a range of other available remedies, such as decertification of the bargaining unit or compelling the parties to bargain in good faith. *See* D.C.Code § 1–617.13(a). The court-ordered injunction simply effectuates the statutory prohibition, which is absolute and mandatory. It is apparent from the explanatory report on the CMPA prepared by the Council's Committee on Government Operations and submitted with the legislation to Congress [9] that the Council intended the prohibition on strikes by District government employees to be enforced strictly and effectively. The Committee Report emphasized the Council's "policy judgment" to reject even a limited right to strike, stating, for example, that "[t]he Council did not want to follow the lenient requirement of Michigan law which permissibly authorizes strikes despite statutory proscription." Comm. Report at 195, 196.

The genesis of the strike prohibition in § 1–617.05 also supports the conclusion that it was intended to enable the Superior Court to enjoin strikes by District government employees. It is a "cardinal rule of statutory construction that when a legislature adopts a statute that is

9. *SEE* COUNCIL OF THE DISTRICT OF COLUMBIA, DISTRICT OF COLUMBIA COMPREHENSIVE MERIT PERSONNEL ACT OF 1978, COMM. REPORT ON BILL NO. 2–10 (July 5, 1978), *reprinted in* HOUSE COMM. ON THE DISTRICT OF COLUMBIA, DISTRICT OF COLUMBIA COMPREHENSIVE MERIT PERSONNEL ACT OF 1978 AND REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, 96th Cong., 1ST SESS. 142 (COMM. PRINT 1979) (HEREINAFTER, "Comm.Report").

modeled after one in effect in another jurisdiction, the legislature is deemed to have adopted as well the judicial constructions of the statute in the jurisdiction in which it originated." *Meiggs v. Associated Builders, Inc.,* 545 A.2d 631, 635 (D.C. 1988). Similarly, "[w]hen a local provision is borrowed directly from a federal statute, the Council [of the District of Columbia] is presumed to have borrowed the judicial construction thereof as well." *Id.* (quoting *Hughes v. District of Columbia Dep't of Employment Servs.,* 498 A.2d 567, 571 n. 8 (D.C.1985)). These canons of construction are instructive here. D.C.Code § 1–617.05 carried forward the formerly applicable ban on strikes by employees of the District of Columbia government that is contained in 5 U.S.C. § 7311.[10] The Council modeled the new provision on New York's "Taylor Law," N.Y. CIV. SERV. LAW § 210 (McKinney 1973).[11] *See* Comm. Report at 195–96; *see also* D.C.Code § 1–632.02(a)(7) (listing 5 U.S.C. § 7311 among the federal laws superseded by the CMPA for all employees of the District of Columbia Government). Federal courts [12] and New York courts [13] had construed 5 U.S.C. § 7311 and the Taylor Law, respectively, to authorize the issuance of injunctions against public employee strikes on govern-ment motion. The Committee Report cited the New York cases in its discussion of the constitutionality of the prohibition. *See* Comm. Report at 196. In view of this uniform precedent, of which the Council was demonstrably aware and implicitly approved, we think that if the Council had not intended D.C.Code § 1–617.05 to furnish the same authorization to the courts of the District, the Council would have said so clearly. The Council did not say so, either in the CMPA itself or in the Committee Report that the Council transmitted to Congress.

The same question of primary versus concurrent jurisdiction that we confront here has arisen under Title VII of the Civil Service Reform Act of 1978, 5 U.S.C. § 1101 *et seq.* ("CSRA"). In addition to the prohibition against public employee strikes in 5 U.S.C. § 7311, the CSRA declares such strikes to be unfair labor practices subject to the enforcement jurisdiction of the Federal Labor Relations Authority (the federal counterpart of the District of Columbia's PERB). *See* 5 U.S.C. § 7116(b)(7) and § 7118. The courts of appeals in both the Second Circuit and the Seventh Circuit have rejected the contention that the CSRA unfair labor

---

10. In pertinent part, 5 U.S.C. § 7311 states that "[a]n individual may not accept or hold a position in the Government of the United States or the government of the District of Columbia if he ... (3) participates in a strike, or asserts the right to strike, against the Government of the United States or the government of the District of Columbia...."

11. N.Y. CIV. SERV. LAW § 210(1) provides: "No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall cause, instigate, encourage, or condone a strike."

12. *See Air Transport Ass'n v. PATCO,* 313 F.Supp. 181 (E.D.N.Y.), *rev'd in part on other grounds,* 438 F.2d 79 (2d Cir.1970); *United States v. Branch 60, Nat'l Ass'n of Letter Carriers,* 312 F.Supp. 619 (D.Conn.1970); *Tennessee Valley Auth. v. Local No. 110, Sheet Metal Workers' Int'l Ass'n,* 233 F.Supp. 997 (W.D.Ky.1962).

13. *See Caso v. Katz,* 67 Misc.2d 793, 324 N.Y.S.2d 712 (N.Y.Sup.Ct.), *aff'd,* 38 A.D.2d 691, 328 N.Y.S.2d 615 (N.Y.App.Div.1971); *Bd. of Educ. v. Shanker,* 54 Misc.2d 641, 283 N.Y.S.2d 432 (N.Y.Sup.Ct.), *aff'd,* 29 A.D.2d 634, 286 N.Y.S.2d 453 (N.Y.App.Div.1967); *City of New York v. De Lury,* 23 N.Y.2d 175, 295 N.Y.S.2d 901, 243 N.E.2d 128 (1968); *New York City Transit Auth. v. Loos,* 2 Misc.2d 733, 154 N.Y.S.2d 209 (N.Y.Sup.Ct.1956), *aff'd,* 3 A.D.2d 740, 161 N.Y.S.2d 564 (N.Y.App.Div.1957).

practice provisions deprive the federal courts of concurrent jurisdiction to enjoin strikes violative of 5 U.S.C. § 7311. *See Air Transport Ass'n v. PATCO,* 667 F.2d 316, 320–23 (2d Cir.1981); *United States v. PATCO,* 653 F.2d 1134, 1138–40 (7th Cir.1981). The reasoning of these decisions parallels our own—in brief, the retention of the prohibition in 5 U.S.C. § 7311 and the legislative history of the CSRA indicate that Congress did not intend to withdraw jurisdiction to enjoin public employee strikes from the district courts; and in the absence of such a demonstrable intent, the law should be construed and enforced so as to achieve its overriding purposes.

For the foregoing reasons, appellants' contention must be rejected. We hold that the CMPA does not deprive the Superior Court of jurisdiction over a complaint by the District of Columbia for injunctive relief against an unlawful strike by government employees.

### B.

The Norris–LaGuardia Act broadly prohibits "courts of the United States" from issuing injunctions in labor disputes:

> No court of the United States, as herein defined, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this Act.

29 U.S.C. § 101; *see also* 29 U.S.C. § 104(a) (specifically barring injunctive re-

lief against strikes in labor disputes).[14] The Act defines the term "court of the United States" to mean "any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia." 29 U.S.C. § 113(d). Although there may be some room for argument on the matter, we shall assume for present purposes that the Superior Court is a "court of the United States" within the meaning of the Norris–LaGuardia Act, since the jurisdiction of the Superior Court is conferred and defined by Act of Congress. *See* 84 Stat. 484 *et seq.,* Pub.L. 91–358, title I, § 111 (July 29, 1970).

The Norris–LaGuardia Act is not quite as broad as it appears on its face, however. In *United States v. United Mine Workers,* 330 U.S. 258, 276–82, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Supreme Court held that the Act was not intended to restrict the right of a sovereign government to secure injunctive relief in a labor dispute with its own employees. The holding of *Mine Workers* applies whether the sovereign in question is the United States (as in that case) or another sovereign body, such as an individual State. *See USX Corp. v. Pennsylvania Dep't of Labor & Indus.,* 643 F.Supp. 1567, 1571 (M.D.Pa.1986); *Almacs, Inc. v. Hackett,* 312 F.Supp. 964, 967 (D.R.I.1970).

Appellants argue that the government of the District of Columbia is not a sovereign State, however, but merely "a body corporate for municipal purposes," D.C.Code § 1–102—the kind of non-sovereign governmental entity to which at least one court has held the *Mine Workers* excep-

---

**14.** The Norris–LaGuardia Act does permit courts to issue injunctive relief against "unlawful acts" that are threatened or that have been committed in labor disputes. *See* 29 U.S.C. § 107. It is not suggested that this exception to the general rule authorizes injunctions against strikes that are prohibited by law. It is unnecessary for us to reach that question in this case, and we express no opinion on it.

tion does not extend. *See Reuter v. Skipper*, 4 F.3d 716, 719–20 (9th Cir.1993) (holding that the Norris–LaGuardia Act applies where an injunction is sought in a labor dispute involving a municipal corporation); *but see Anderson v. Edwards*, 505 F.Supp. 1043, 1047 (S.D.Ala.1981) (holding that the Norris–LaGuardia Act did not prevent the court from issuing an injunction in a dispute between the City of Mobile and its employees); *Lake Michigan College Fed'n of Teachers v. Lake Michigan Cmty. College*, 390 F.Supp. 103, 135 (W.D.Mich.1974), *rev'd on other grounds*, 518 F.2d 1091 (6th Cir.1975) (holding that the Act did not bar issuance of an injunction in an employment dispute between a public junior college and its faculty).

■ Whatever the merits of the argument that municipal corporations in general cannot lay claim to the "sovereign" exception to the Norris–LaGuardia Act, we think the argument fails in the case of the District of Columbia. The government of the District is not just another municipal corporation. Amongst political entities the District has a "unique status"; it is "truly *sui generis* in our governmental structure." *District of Columbia v. Carter*, 409 U.S. 418, 432, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). Whether the District of Columbia should be equated to a sovereign State for purposes of a particular statute depends upon the context, including "the character and aim of the specific provision involved." *Id.* at 420, 93 S.Ct. 602.

In the context of public employee labor relations and the Norris–LaGuardia Act, the District of Columbia government is akin to a sovereign State. By means of the District of Columbia Self–Government and Governmental Reorganization Act (Home Rule Act), Congress expanded the District's "powers of local self-government"; among other things, the Act is designed, "to the greatest extent possible,

consistent with the constitutional mandate, [to] relieve Congress of the burden of legislating upon essentially local District matters." D.C.Code § 1–201.02(a) (2001). *See also Shook v. District of Columbia Fin. Responsibility & Management Assistance Auth.*, 328 U.S.App. D.C. 74, 75, 132 F.3d 775, 776 (1998) (characterizing the District Charter established by the Home Rule Act as "[s]imilar in certain respects to a state constitution"). To that end, the Home Rule Act delegated to the District plenary responsibility to establish and administer the laws regulating local government employees. *See* D.C.Code § 1–204.22(3). The Council responded to that delegation of power by promulgating the CMPA, which, as has been discussed, outlaws strikes by District government employees and authorizes the Superior Court to grant the District government injunctive relief against such strikes. The District of Columbia government is thus both the *de jure* and the *de facto* sovereign with respect to local public employee labor relations in the District. Under the authority of *Mine Workers*, we conclude that the Norris–LaGuardia Act therefore does not preclude the District of Columbia government from applying to its courts to enjoin an unlawful strike by its employees.

C.

■ In exercising its discretion to grant or deny preliminary injunctive relief, a trial court must consider four criteria:

A proper exercise of discretion requires the trial court to consider whether the moving party has clearly demonstrated (1) that there is a substantial likelihood he [or she] will prevail on the merits; (2) that he [or she] is in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to him [or her] from the denial of the injunction than will result to the

defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order.

*District of Columbia v. Group Ins. Admin.*, 633 A.2d at 21 (quoting *Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C.1976)). In reviewing the trial court's exercise of discretion, " 'our role ... is not to resolve the merits of the underlying dispute between the litigants,' except insofar as 'the action of the trial court turns on a question of law or statutory interpretation.' " *Group Ins. Admin.*, 633 A.2d at 22 (quoting *Don't Tear It Down, Inc. v. District of Columbia*, 395 A.2d 388, 390, 391 (D.C. 1978)). "Rather, our role is confined to (1) examining the trial court's findings and conclusions to see if they are sufficiently supported by the record; (2) assuring that the trial court's analysis reflects a resolution of all the issues which necessarily underlie the issuance of an injunction; and (3) inquiring into any other claims of an abuse of discretion by the trial court." *Wieck*, 350 A.2d at 387; *accord, Group Ins. Admin.*, 633 A.2d at 22.

In challenging Judge Zeldon's exercise of discretion in the present case, appellants do not dispute that her factual findings are supported by sufficient evidence in the record. Nor do appellants contend that Judge Zeldon failed to consider and make findings on the four criteria that must be satisfied for a preliminary injunction to issue. Rather, appellants raise three discrete issues.

▮ First, attacking the finding of a likelihood of success on the merits, appellants argue that a strike against the District of Columbia Board of Education is not a prohibited strike "against the District" within the meaning of D.C.Code § 1–

617.05. Appellants premise this argument on the status of the Board of Education as an independent agency of government, *see* D.C.Code § 1–204.95, for which the CMPA created a "separate personnel management system[ ]." D.C.Code § 1–601.02(a)(3). The argument is fallacious, however. Although the Board of Education is an independent agency, the Board is still, as the CMPA states, one of the "subdivisions of the District government." D.C.Code § 1–601.01(3) (2001). Lest there be any question, D.C.Code § 1–603.01(13) defines the term "independent agency" for purposes of the CMPA to mean "any board or commission *of the District of Columbia government* not subject to the administrative control of the Mayor, *including*, but not limited to, *the District of Columbia Board of Education ....* " (Emphasis added.) And the CMPA expressly directs the Board of Education to issue rules and regulations to implement the provisions of subchapter XVII (the subchapter that includes D.C.Code § 1–617.05) "for all employees under [its] respective jurisdiction[ ]." D.C.Code § 1–604.04(d).[15] In view of these provisions, we have no hesitation in holding that for purposes of D.C.Code § 1–617.05, an employee of the Board of Education is a "District government employee" and a strike against the Board is "a strike against the District."

▮ Appellants' remaining contentions do not merit extended discussion. Judge Zeldon's factual findings, set forth in footnote 5, *supra*, amply support her determination of irreparable injury. Those findings confirm the Teamsters' own prediction that a strike would cause "major chaos in the school system." As for appel-

---

15. In accordance with that directive, Board of Education regulations prohibit strikes and authorize the Board to bring an action in Superior Court to enjoin a strike. *See* 5 DCMR § 613.3 (2003).

lants' claim that the DCPS had "unclean hands" because it had not bargained in good faith, the "unclean hands" doctrine is inapplicable here. *See International Tours & Travel, Inc. v. Khalil,* 491 A.2d 1149, 1155 (D.C.1985) ("The equitable doctrine of unclean hands only applies where there is misconduct by the plaintiff *in the same transaction* that is the subject of his claim.") (emphasis added). If the DCPS failed to bargain with the Teamsters in good faith, that fact would justify an unfair labor practice complaint before the PERB. It would not justify a strike in violation of law. The DCPS's alleged failure to bargain in good faith does not undermine Judge Zeldon's determinations that the threatened strike would be illegal, that it would cause irreparable injury, and that the balance of harms and the public interest weighed in favor of preventing the strike. We see no reason to disturb Judge Zeldon's ruling.

### III.

For the foregoing reasons, we affirm the order entering a preliminary injunction and remand this case for further proceedings.

*So ordered.*